UNITED STATES, Appellee,

v.

Joseph F. SCHNEIDER, Mess Management Specialist Seaman Recruit, U. S. Navy, Appellant.

No. 40454.
NCM 80–1524.

U. S. Court of Military Appeals.

Nov. 8, 1982.

For Appellant: *Lieutenant Lynn M. Maynard, JAGC, USN* (argued).

For Appellee: *Lieutenant Wm. Eric Minamyer, JAGC, USNR* (argued); *Captain T. C. Watson, Jr., JAGC, USN* (on brief).

## OPINION OF THE COURT

COOK, Judge:

Tried by general court-martial, military judge alone, the accused was convicted, despite his pleas, of four specifications of willfully destroying government property; one specification of damaging property other than military property; two specifications of arson; and one specification of communi-

cating a threat, in violation of Articles 108, 109, 126 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 908, 909, 926 and 934, respectively. The approved sentence extends to a dishonorable discharge, confinement at hard labor for 15 months, forfeiture of $400 pay per month for 15 months and a fine of $1,000.00. The Court of Military Review affirmed in an unpublished opinion.

We granted accused's petition for review on the following issue:

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT WHEN HE DENIED THE DEFENSE MOTION TO SUPPRESS THE CONFESSION (PROSECUTION EXHIBIT 2) MADE AS A RESULT OF (A) A CUSTODIAL INTERROGATION BASED ON AN INSUFFICIENT SHOWING OF PROBABLE CAUSE, AND (B) ILLEGAL THREATS AND PROMISES.

We find no error and affirm.

I

During the months of May and June 1979, fires were set on four different occasions in the bachelor enlisted quarters (Building 447) at the Naval Education and Training Center, Newport, Rhode Island. The first two fires involved trash cans. Then, on June 5, a chair was set on fire in the second-floor laundry room. Finally, on June 7, a dresser was ignited in the fourth-floor stairwell. An investigation of the latter two fires was started by the Naval Investigative Service Resident Agency (NISRA).[1] Preliminary information disclosed that: the accused had been the fire guard on all four nights and had made "all secure" entries in the fire-watch log for the approximate times at which the fires started; the accused had been the first person at the scene of the fires; there were no witnesses to the starting of the fires; and the accused was one of two individuals who had

received medical treatment for smoke inhalation after both of the last two fires. The accused was interviewed after the first June fire, but only as a witness—not as a suspect. After the second June fire, the accused became a suspect in the eyes of the NISRA agents. Special Agent Scovel had learned in training that, frequently, the first person who arrived at the scene of a fire was the person who set the fire and had the "hero syndrome." He also knew that the accused was charged with a violation of the enlisted quarters' regulations and postulated that the accused might have a motive either for revenge or to enhance his standing with the command by putting out the fires. A check into the fire-watch logs for the recent past disclosed that the accused had the fire watch when all four fires occurred, but during the time the accused was out of the barracks, there had been no fires. The doctor treating the accused told the agents that he might be faking the symptoms. Finally, although certain witnesses were discovered who could verify the estimated times that the fires were started, NISRA had eliminated all other suspects. Based upon this investigative predicate, NISRA had the accused brought from the hospital to that office for interrogation.

After being read his rights, the accused first denied having started the fires, but subsequently admitted that he had done so. At trial, defense counsel moved to suppress the statement. The military judge denied the motion. Appellate defense counsel contend that the accused's statement was the result of a custodial interrogation based upon an insufficient showing of probable cause, and cite *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Appellate government counsel counter by asserting that the agents had probable cause under *Dunaway* to "seize" the accused for questioning, even though he was not "apprehended" in the sense of Article 7, UCMJ, 10 U.S.C. § 807.[2]

---

1. The first two fires were not investigated by the Naval Investigative Service (NIS) and were not charged here. The fact of their happening

was offered solely to establish the reasonableness of the suspicions of the NIS agents.

2. The military equivalent of "arrest" is apprehension. A military person may be ap-

In *Dunaway* a Rochester detective investigating the killing of the proprietor of a pizza parlor was told by another officer that an informant had supplied a possible lead implicating Dunaway in the crime. The detective questioned the source but learned nothing that would supply enough information to obtain a warrant for Dunaway's arrest. Nonetheless, the detective ordered Dunaway to be picked up by other detectives and brought to the police station for questioning. Dunaway was taken into custody, although not arrested, and brought to the police station interrogation room. After being read the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct.

1602, 16 L.Ed.2d 694 (1966), Dunaway made incriminating statements and sketches. He was tried and convicted. After affirmances by the New York courts, the Supreme Court vacated his conviction and remanded the case for further consideration in light of its decision in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).[3] The trial court was "directed . . . to make . . . findings as to whether there was a detention of" Dunaway; whether there was probable cause for the detention; and, if a detention without probable cause occurred, "whether the . . . confessions . . . [were] rendered infirm by the illegal arrest." 442 U.S. at 204–05, 99 S.Ct. at 2252. Pursuant

prehended "upon reasonable belief that an offense has been committed and that the person apprehended committed it." Article 7(b), Uniform Code of Military Justice, 10 U.S.C. § 807(b). "Apprehension is" defined as "the taking of a person into custody." Article 7(a). "Custody is that restraint of free locomotion which is imposed by lawful apprehension. The restraint may be corporeal and forcible or, once there has been a submission to apprehension or a forcible taking into custody, it may consist of control exercised in the presence of the prisoner by official acts or orders." Para. 174*d*, Manual for Courts-Martial, United States, 1969 (Revised edition). *See generally United States v. Ream*, 1 M.J. 759 (A.F.C.M.R.1975); *United States v. Fleener*, 21 U.S.C.M.A. 174, 44 C.M.R. 228 (1972); *cf. United States v. Felty*, 12 M.J. 438 (C.M.A.1982).

3. In *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), petitioner was "arrested" by Chicago police detectives who had illegally entered and searched his apartment. No evidence of an incriminating nature was found either in the apartment or on petitioner. Although Brown was told that he was "under arrest," there was no probable cause to arrest him. The sole relationship between Brown and the murder-victim was that he was named as an acquaintance of the victim. Petitioner was taken to the police station and interrogated. He was warned of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and eventually made a two-page incriminating statement. Later he was further interrogated by an assistant state's attorney who also advised him of his *Miranda* rights. Brown was convicted of murder and sentenced to imprisonment. On appeal the Illinois Supreme Court concluded that Brown's arrest was not based upon probable cause and was unlawful, but in effect "held that the *Miranda* warnings in and of them-

selves broke the causal chain so that any subsequent statement, even one induced by the continuing effects of unconstitutional custody, was admissible so long as, in the traditional sense, it was voluntary and not coerced in violation of the Fifth and Fourteenth Amendments." 422 U.S. at 597, 95 S.Ct. at 2258. The Supreme Court, reversing on the basis of *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), held that "[t]he exclusionary rule . . . applied in *Wong Sun*" was "*primarily* [intended] to protect Fourth Amendment rights," not Fifth Amendment rights, whereas *Miranda* was designed to protect Fifth Amendment rights. 422 U.S. at 599, 95 S.Ct. at 2259. But because of the "intimate relation" between the two Amendments, *Boyd v. United States*, 116 U.S. 616, 633, 6 S.Ct. 524, 533, 29 L.Ed. 746 (1886), exclusion of a confession for failure to give *Miranda* warnings would not suffice to fully protect against a Fourth-Amendment violation. Thus, the Court reasoned, the deterrent effect of the exclusionary rule would be eroded if the *Miranda* warnings by themselves sufficed to cleanse a Fourth-Amendment violation. But the Court refused to adopt a *per se* rule, preferring to leave the question of whether a confession is the product of a free will under *Wong Sun* to be decided on the basis of the facts in each case. "[I]n determining whether the confession is obtained by exploitation of an illegal arrest," the Court must consider: "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, . . . , the purpose and flagrancy of the official misconduct." 422 U.S. at 603–04, 95 S.Ct. at 2261–62. Holding that "[t]he impropriety of the arrest was obvious," the Court remanded the case solely on the "error" of the Illinois courts in holding "that the *Miranda* warnings . . . always purge the taint of an illegal arrest." *Id.* 422 U.S. at 605, 95 S.Ct. at 2262.

to this mandate, the trial court found no probable cause to support the arrest of Dunaway and that the full *Miranda* warnings were insufficient to "purge the taint of the defendant's illegal seizure." *Id.* 442 U.S. at 205–06, 99 S.Ct. at 2252–53. Therefore, Dunaway's motion to suppress the confession was granted. The Appellate Division reversed on the ground that "the taint of . . . [the] illegal detention was sufficiently attenuated to allow the admission of his . . . [confession] and sketches." *Id.* 442 U.S. at 206, 99 S.Ct. at 2253. For the second time, the Supreme Court granted *certiorari.* Rejecting the state's argument that a balancing test should be applied to custodial interrogations in accordance with *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that "[t]he narrow intrusions involved in those cases" following *Terry* would only be permitted "because . . . [those] intrusions fell far short of the kind of intrusion associated with an arrest" and that the surrounding circumstances of this case reveal a seizure of Dunaway requiring probable cause. 442 U.S. at 212, 99 S.Ct. at 2256. In addition, the fact that proper *Miranda* warnings were given was not, in and of itself, sufficient to attenuate the illegal detention which produced the incriminating statements.

If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. . . . Arrests made without warrant or without probable cause, for questioning or "investigation," would be encouraged by the knowledge that evidence

derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings.

442 U.S. at 217, 99 S.Ct. at 2259 (quoting *Brown v. Illinois, supra* 422 U.S. at 602, 95 S.Ct. at 2261). Hence, since Dunaway "was . . . seized without probable cause in the hope that something might turn up, and confessed without any intervening event of significance," 442 U.S. at 218, 99 S.Ct. at 2259 (footnote omitted), his seizure violated the Fourth Amendment and the resultant confession was properly suppressed.

There are obvious differences between the military and civilian practices which prevent literal application of the *Dunaway* doctrine. The obligations of the military member occasioned by his military status and by the relationships inherent in a military organization are different from those of the citizen to the police. There are numerous situations in the military context where a military person is required to provide information to military authorities without consideration of the existence of probable cause to detain. *See United States v. Lewis,* 12 M.J. 205 (C.M.A.1982); *United States v. Davenport,* 9 M.J. 364 (C.M.A.1980); *United States v. Seay,* 1 M.J. 201, 204–05 (C.M.A.1975) (Cook, J., concurring in the result); *United States v. Haskins,* 11 U.S.C.M.A. 365, 29 C.M.R. 181 (1960); *United States v. Aronson,* 8 U.S.C. M.A. 525, 25 C.M.R. 29 (1957). This may occur on the street, in offices, and in hearing rooms, as well as in places specifically provided for interrogation. And the obligation to report to such places for the purpose of giving such information, if properly related to the military mission, is a valid military duty.[4] It is the recognition of this

4. Of course the choice of the place for questioning *may be based on considerations other than those which would give rise to an "in-custody" conclusion.* In *United States v. Chatman,* 573 F.2d 565 (9th Cir. 1977), the appellant was stopped in the San Francisco airport by Drug Enforcement agents *"for interrogation"* based upon certain information in their possession. He was taken to an interview room. On appeal he contended "that the act of directing him to proceed to an interview room constituted an arrest and that probable cause should

have existed at that time." In holding against this contention, the Court of Appeals said:

Founded suspicion based on the facts then known to the agent justified the interrogation, and it was not improper, *in absence of protest or coercive circumstances,* to arrange that it take place free from public view with its attendant embarrassment.

*Id.* at 567 (emphasis added).

Similarly, in *United States v. Salter,* 521 F.2d 1326 (2d Cir. 1975), the Court saw "nothing wrong in . . . asking Salter to step into the

peculiar military obligation that compelled the Congress to provide safeguards against self-incrimination, not to suspend the necessary flow of information but to protect the unwary subordinate against the subtle coercion of the military rank structure. Article 31, UCMJ, 10 U.S.C. § 831; *United States v. Lewis, supra,* and cases cited therein; *United States v. Tempia,* 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967). Thus, in the military milieu, the focus has been on the protections accorded by Article 31, the Fifth Amendment equivalent, rather than on the nature of the infringement of the person's freedom of movement (Fourth Amendment).

> The test to be applied is not whether the accused, technically, has been taken into custody, but, absent that, whether he has been "otherwise deprived of his freedom of action in any significant way." [Citation omitted.] Here, the accused was clearly summoned for interrogation. Had he not obeyed, he would have undoubtedly subjected himself to being penalized for a failure to repair. [Citations omitted.] In the military, unlike civil life, a suspect may be required to report and submit to questioning quite without regard to warrants or other legal process. It ignores the realities of that situation to say that one ordered to appear for interrogation has not been significantly deprived of his freedom of action.

*United States v. Tempia, supra* at 636, 37 C.M.R. at 256.

However, we are not free to ignore the decisions of the Supreme Court, but must, instead, attempt to fit them into the context of military society. Now our examination must begin, not end, with the determination that Article 31/*Tempia* warnings have been properly given. After having crossed the "threshold requirement" of "voluntariness," we must look to the condi-

tions surrounding the taking of the accused's confession to see if they amount to custodial interrogation. *Dunaway v. New York, supra* 442 U.S. at 217, 99 S.Ct. at 2259. If the accused was in custody in terms of Article 7, we must test for probable cause to justify the apprehension. *Cf. Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Next, if we conclude that the accused was held in custody without probable cause justifying his apprehension, we must examine "the causal connection between the illegality and the confession." *Brown v. Illinois, supra,* 422 U.S. at 603, 95 S.Ct. at 2261. "[I]n determining whether the confession is obtained by exploitation of an illegal arrest," the Court must consider "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct . . . . And the burden of showing admissibility rests, of course, on the prosecution." *Brown v. Illinois, supra* 422 U.S. at 603–04, 95 S.Ct. at 2261–62, quoted with approval in *Dunaway v. New York, supra* 442 U.S. at 218, 99 S.Ct. at 2259. Should there be insufficient attenuation between the illegal custody and the confession flowing therefrom, the confession may not be admitted. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Dunaway v. New York, supra.*

 Here the accused was brought to the NISRA office under guard in circumstances clearly indicating that he was a suspect. We believe that such a situation is similar to that in *Dunaway* and that probable cause for his apprehension was required.[5] This is a higher degree of certainty than the mere suspicion which triggers

---

baggage room, a place more convenient for interrogation than an open platform; in any event this had no causal relation to what transpired." 521 F.2d at 1328–29.

Thus, the choice of the place for the interrogation is but *another* factor, not a *conclusive* factor. *See* n. 3, *supra; see also United States v. Leiffer,* 13 M.J. 337 (C.M.A.1982).

5. Both trial and defense counsel proceeded on the premise that under the circumstances of this case, the Government was required to establish probable cause for the "custodial interrogation" of the accused.

the obligation to inform the suspect of his Article 31/*Tempia* rights. Probable cause *is not* proof beyond a reasonable doubt, but it *is* more than bare suspicion. It "exists where 'the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949), quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). It is "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States, supra* 338 U.S. at 175, 69 S.Ct. at 1310. Put another way:

> Probable cause is not a philosophical concept existing in a vacuum; it is a practical and factual matter. A fact which spells reasonable cause to a doctor may make no impression on a carpenter, and vice versa. Did the person who made the arrest, if a reasonable and prudent man, have probable cause? An officer experienced in the narcotics traffic may find probable cause in the smell of drugs and the appearance of paraphernalia which to the lay eye is without significance. His action is not measured by what might be probable cause to an untrained civilian passerby. When a peace officer makes the arrest the standard means a reasonable, cautious and prudent peace officer. The question is what constituted probable cause in the eyes of a reasonable, cautious and prudent peace officer under the circumstances of the moment.

*Bell v. United States,* 254 F.2d 82, 85–86 (D.C.Cir.1958), *cert. denied,* 358 U.S. 885, 79 S.Ct. 126, 3 L.Ed.2d 113 (1958); *see also United States v. Powell,* 7 M.J. 435, 436 (C.M.A.1979); *Bailey v. United States,* 389 F.2d 305 (D.C.Cir.1967).

■ The record before us establishes that at the time the accused was brought to the NISRA office for interrogation, the agents had the following information available to them:

(1) The accused had the fire watch at the time of each of the four fires;

(2) The fire watch log entries made by accused indicated that all was secure during his rounds at the time of the 5 and 7 June fires; but statements of witnesses to the fires and estimates of when the fires began made by fire officials indicated that the accused should have detected the fires during his rounds;

(3) The accused was the first person on the scene of the last two fires; the NIS agents felt, based on their training and experience, that this may have indicated that the accused had the "hero syndrome";

(4) The accused was charged with a barracks-regulation violation and with an unauthorized absence which the agents considered as a motive either for revenge or to enhance his standing with the command by putting out the fires;

(5) The agents, during their investigation, had systematically eliminated all other suspects, but could not eliminate the accused;

(6) There were no fires between 29 May when the accused checked into the Navy Lodge and 4 June when the accused returned to the barracks;

(7) The doctor treating the accused for smoke inhalation told the agents that the accused could be faking.

Considered cumulatively these facts constitute virtually a *prima facie* case of circumstantial evidence against the accused and unquestionably amount to probable cause for taking him into custody.[6]

---

**6.** The NIS agents denied that the accused was apprehended but agreed that he was in their "custody" during the interrogation. By this they meant that at the conclusion of the interrogation they were obligated to return him to the hospital since he had been brought to them

from that place—i.e., they would return him to the control of the organization from whence he had come. However, it is from the examination of all the circumstances that the legal connotation to be applied to his status must come, not necessarily from the subjective in-

In reaching our decision we do not wish to be thought to hold that every interrogation at the "police station" amounts to custodial interrogation.[7] The conditions under which an accused comes to the office bear examination: Did he report voluntarily? Was he ordered to report? Was he brought in under guard? Was he a suspect? Further, what relation do these conditions have to the interrogation? Was the accused free to leave at any time? May he depart by himself? Must he remain under guard? Lastly, do these conditions directly relate causally to the accused's decision to make a confession? These are all questions which should be developed at trial—where applicable—before the military judge rules on the admissibility of the confession. Here the record amply supports the ruling of the military judge admitting the accused's statement.

## II

Appellate defense counsel further contend that the accused's confession was the product of illegal threats and inducements. At trial the accused testified on the issue of the voluntariness of the statement. He said that the NIS agents read him his "rights before they could talk," but "they said it was a formality." He continued that the NISRA agents told him that: "they were going to help me out and do me a favor"; they would keep it quiet and not

tent of the agents. *But see United States v. Morin,* 665 F.2d 765 (5th Cir. 1982). "[E]xclusionary rules should embody objective criteria rather than subjective considerations." *Dunaway v. New York,* 442 U.S. 200, 221, 99 S.Ct. 2248, 2261, 60 L.Ed.2d 824 (Stevens, J., concurring).

7. We are not the only court laboring with this difficulty:

The issue of when a "seizure" of an individual has occurred and the quantum of proof necessary to justify such a seizure is an unsettled one . . . . [T]his Circuit has held that a seizure requires only reasonable suspicion [citations omitted]; on the other hand, we have also held that a seizure is an arrest requiring probable cause. [Citations omitted].

tell the people in the BEQ that he had set the fires; the people in the BEQ "were extremely mad about the fires and that" if it was discovered that he set the fires, "they would probably—end up finding me hurt or washed up on the shore of the bay." The accused also said that the NISRA agents told him that if he cooperated he might get a discharge and would arrange for him to see a psychiatrist. On cross-examination the accused admitted that: he was the one who wanted the investigation kept quiet; he raised the question of the discharge; and he asked for a psychiatric appointment. The two NISRA agents present at the interrogation denied threatening the accused about being washed up in the bay and said that the psychiatrist was mentioned because the accused was so tense and distraught. In sum they denied or contradicted the accused's version of the matters.

The military judge was the trier of fact and heard and saw the witnesses. By denying the motion and admitting the confession, he manifested his disbelief of the accused's testimony. We have examined the record of trial and find no reason to overturn his rulings.

The decision of the United States Navy Court of Military Review is affirmed.

Chief Judge EVERETT and Judge FLETCHER concur.

Part of the conflict is a result of differing definitions of the word "seizure." Whether a seizure should be treated (a) as an arrest requiring probable cause, (b) as a police-citizen contact requiring no justification, or (c) as an intermediate concept between these two extremes requiring reasonable suspicion, is an issue that has not been squarely addressed by this Circuit. [Citations omitted]. The dominant view in this Circuit appears to be that a seizure occurs when an individual is no longer free to leave and is justified when supported by reasonable, articulable suspicion.

*United States v. Herbst,* 641 F.2d 1161, 1167 n. 8 (5th Cir. 1981), *cert. denied,* 454 U.S. 851, 102 S.Ct. 292, 70 L.Ed.2d 141 (1981); *see also United States v. Morin, supra* at 770.