## UNITED STATES

v.

**Welton J. SCOTT, 462 92 1296, Engineman Fireman (E–3), U.S. Navy.**

NMCM 81 1257.

U.S. Navy-Marine Corps Court of
Military Review.

Sentence Adjudged 30 Oct. 1980.

Decided 29 Dec. 1983.

LCDR William A. DeCicco, JAGC, USN,
Appellate Defense Counsel.

LCDR John B. Holt, JAGC, USN, Appellate Government Counsel.

Before ABERNATHY, Senior Judge, and MITCHELL and BARR, JJ.

MITCHELL, Judge:

By order of the Court of Military Appeals, this Court's decision in *United States v. Scott*, 13 M.J. 874 (N.M.C.M.R.1982), was reversed and the case remanded to this court for further consideration in the light of *United States v. Schneider*, 14 M.J. 189 (C.M.A.1982). At issue is whether certain derivative incriminating evidence was erroneously considered at trial because of an alleged unlawful seizure of the appellant. *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *United States v. Schneider, supra.*

Based on the evidence of record including the trial briefs of counsel at the trial, we find that on 19 July 1980, the body of a sailor was found within the security perimeter of the Ship Repair Facility (SRF), U.S. Naval Station, Guam. The victim had been repeatedly stabbed and left a significant trail of blood leading from the apparent location of the stabbing to the place where he was found. The location of the body, the security procedures governing access to the SRF and the roughly approximated time of death (0330–0440) pinpointed as suspects a number of crew members from the USS KINKAID, then located at the SRF, who returned to the ship between approximately 0200 and 0300. The KINKAID was apparently the only crewed ship in the SRF at the time and was due to depart within four days. Crime scene examination and initial shipboard questioning resulted in the determinations that the whereabouts of the appellant and one STSN Price at the critical times could not be verified and that they boarded the KINKAID together at about 0300.

After completing the initial investigation at the ship and crime scene the formal questioning of witnesses began. Questioning was conducted at the NIS office spaces. Through coordination with the commands

of the KINKAID and Naval Station, Guam, a vehicle and security personnel were made available to transport witnesses from the KINKAID, who had been made "available" by the command, to the NIS office spaces and back to the KINKAID. During the course of these interviews STSN Price was questioned. As a result of that interview, the NIS investigator decided to question the appellant next in order. The NIS investigator asked the assistant station security officer, Senior Chief Waters, if he could make arrangements to have the appellant available in his office. Chief Waters told one of the detailed security persons, Heim, to bring the appellant to the NIS office for questioning. The NIS investigator did not inform either Chief Waters or Heim that the appellant was a suspect nor did he indicate that the appellant was anything other than another witness. Heim went to the KINKAID and coordinated with Gunner's Mate (Missiles) First Class (GMM–1) Ah Nee, who was on the day of the investigation assigned duty as Duty Master-at-Arms and who apparently was the point of contact for obtaining witnesses from the KINKAID. GMM–1 Ah Nee determined that the appellant was not aboard ship at the time but was at the beach. GMM–1 Ah Nee and Heim got into the shore patrol vehicle and went to the beach. Upon arrival GMM–1 Ah Nee summoned the appellant to the vehicle. He asked appellant to show his ID card and told him that he had to go to the NIS office. This latter statement is equivocal in meaning, but we assume it was directive. The appellant got into the vehicle, without manifesting dissent or an unwillingness to go, and was driven to the NIS office.

At the NIS office the appellant was taken into the waiting area and told by GMM–1 Ah Nee to have a seat. GMM–1 Ah Nee, for a time, positioned himself by the door but departed before questioning of the appellant was completed. Chief Waters informed the NIS investigator that the appellant was present. About ten minutes later the investigator came out of his office to take the appellant in for questioning. During this time three other witnesses from

the KINKAID, as well as other NIS and support personnel, were in the area, but the whereabouts of GMM–1 Ah Nee at the time the investigator met the appellant is not clear from the record. The NIS office spaces, located in the Naval Station Headquarters building, were basically of normal administrative character. They were not graced with bars, guards or other apparent security devices or structures. The appellant was not told by anyone that he could not leave the spaces.

When questioned, the appellant was fully advised of his Uniform Code of Military Justice, Article 31, 10 U.S.C. § 831 rights, including his right to terminate the interview at any time. Had the appellant decided to terminate the interview, the NIS investigator would not have let him walk out the door unfettered but would have provided him transportation back to the ship in accordance with the previous arrangements made with the appellant's command and customary procedure. The appellant waived his pertinent rights and confidently jousted with the NIS agent over inconsistencies between his and Price's stories. The appellant denied knowing the victim, denied any involvement in the matter, but did agree to a search of his locker. On the way back to the ship the appellant was accompanied by the investigator, another agent, who was driving the vehicle, Price and another witness named Sumler, who were being returned to the ship following their interrogations. On the way, the three sailors joked about the KINKAID's food quality. The search resulted in the seizure of blood-stained levis which ultimately led to a full confession by the appellant.

This court previously and erroneously decided that the doctrine espoused in *Dunaway v. New York, supra,* and *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), was not applicable to any extent in a military setting and that no illegal seizure had taken place. *United States v. Schneider, supra,* held that *Dunaway* does apply in the military setting, but left undecided the difference in the application due because of the peculiar nature of

that society. *See also, United States v. Sanford,* 12 M.J. 170 (C.M.A.1981). We need not decide the more esoteric question of the extent to which *Dunaway* may be literally applied to military cases.

■ At the time the NIS investigator asked to have the appellant made available for questioning, the investigator suspected him of being involved in the murder. The investigator did not communicate that suspicion to either Chief Waters or to Heim. He did not order them to apprehend appellant, but merely asked to have him transported from the ship to the NIS office. As far as Chief Waters and Heim knew, the appellant was just another witness to be interviewed, no one intended to have the appellant treated any differently than the others. When Heim found that the accused was not aboard the KINKAID he was taken by the point of contact, GMM–1 Ah Nee, to the beach. It was the command representative, GMM–1 Ah Nee, a superior of the appellant, not the shore patrolman, Heim, who summoned the appellant to the vehicle to verify appellant's identity and then order him to go to the NIS office. He invoked command, vice law enforcement, authority. The ID card was not seized. The appellant was not informed that he was a suspect or was under investigation. He was not informed that he was being apprehended nor were there other formalities normally associated with apprehension. He was not subject to restraint and he was not ordered to get into the vehicle. No rights warnings were issued at this time. No pat down, frisk or search was conducted at the time. There was no manifestation by the appellant at the time that he objected to this order or that he did not want to go to the NIS office. The appellant did, however, subordinate himself to GMM–1 Ah Nee's order. Since the appellant had not been at the ship and it was necessary to find him, there was nothing unusual about transporting him in the available vehicle nor about Heim, the driver, and GMM–1 Ah Nee accompanying the appellant in the vehicle. Such accompaniment does not create the "under guard" situation apparently present in *United States v. Schneider, supra,* but

was more akin to the escort situation in *United States v. Sanford, supra,* and was generated by the practicalities of the moment. The appellant was afoot and GMM–1 Ah Nee had a vehicle. GMM–1 Ah Nee did not hold himself out to be a policeman nor did he say that any law enforcement purpose was being served by his actions. While the appellant asserted in his trial brief that he acquiesced to the authority of GMM–1 Ah Nee, he did not claim that he considered himself to be under apprehension. Given the location of the appellant, GMM–1 Ah Nee and Heim were merely facilitating the orderly shuttling of witnesses as arranged between Naval Station, NIS and appellant's command. At NIS, appellant sat in a waiting area of normal administrative offices with at least three other witnesses. He was advised within a few minutes by the investigator that he could terminate the interview at any time and, other than assuring appellant's return to the ship, the investigator would have honored such a decision. Considering the deployed military setting in which there exists more command control and accountability of whereabouts than in civilian life, this circumstance amounts to the freedom to leave. *See generally, United States v. Hardison,* 17 M.J. 701 (N.M.C.M.R.1983). The limitations under which the appellant would have been set free at the NIS office, if he so chose, were the limitations imposed by the command and control character of military organization, the customary practice of NIS in dealing with that character, and the practical problem of securing transportation for a sailor otherwise afoot. They were not limitations imposed by policemen. In these circumstances we find that the appellant was not seized within the meaning of *Dunaway v. New York, supra. See United States v. Sanford, supra.* To hold otherwise is to render the expeditious investigation of crimes within the highly mobile sea services cumbersome, if not impossible. *See United States v. Hardison, supra.*

■ Assuming *arguendo* that a seizure of the person did occur in this case, we find

that the NIS investigator knew the following facts concerning the case:

1. The victim was stabbed to death sometime after he and three others entered the SRF in the victim's automobile headed to the USS KINKAID at 0226 on 19 July 1980. The KINKAID was the only manned ship in the SRF at the time and there were no other berthing or messing facilities at the compound.

2. The SRF compound sentry detected the odor of marijuana emanating from the car and noticed the occupant's intoxicated behavior.

3. A crime scene search revealed a pair of sunglasses not belonging to the victim which were similar to those worn constantly by STSN Price. Price and appellant were best friends. Price met the victim the evening of 18 July 1980.

4. All of the crew members of the KINKAID who returned to the ship between 0215 and 0300 had verified whereabouts the night of the murder except STSN Price and the appellant.

5. Price and the appellant were constantly together from 2200 until they returned to the KINKAID together about 0300.

6. Price admitted that he knew the victim and that he and the appellant were in close proximity to the place of the murder about the critical time. He admitted that they smoked marijuana at the time to sober up from the night's drinking.

7. After Price boarded the KINKAID he changed clothes, put his shirt on inside out, borrowed a flashlight and left the ship to search for a lost wallet. He walked an area in the immediate vicinity of the murder.

8. Price did not have his sunglasses when interviewed by NIS, even though he was habituated to wearing them day and night.

9. The NIS agent doubted the veracity of Price for the following reasons:

a. His account of the evening's activities, distances travelled, considering mode of transportation, and travel time, was implausible.

b. Price could not recall the amount of the taxi fare he claimed he paid when he returned to the ship.

c. The circumstances in which Price supposedly lost his wallet getting out of the vehicle were implausible to the NIS agent.

d. Price's description of the taxi driver as being Guamanian did not reconcile with the investigator's street knowledge of the differences in the physical characteristics of Guamanians and persons of Oriental descent nor with the apparent Chinese or Korean surname of the taxi driver who logged into the SRF during the critical period.

e. Price's denial that, after changing clothes, he left the immediate vicinity of the corner of a pierside building midships of the KINKAID did not square with an eyewitness account of his walking to the immediate vicinity of the murder near a building aft of and inland from the KINKAID.

f. Price's claim that a friend, Sumler, witnessed the meeting of Price and the victim at 1800 on 18 July was denied by Sumler. The nature of that conversation with the victim, described by Price as hometown "chit chat," did not square with known facts regarding Price's background.

g. Price had not replaced, by the time of his interview with NIS, the sunglasses he claimed he lost two weeks earlier during a stop in New Guinea notwithstanding his being habituated to wearing them constantly, day and night.

On these facts we find ample probable cause for the NIS investigator to cause the seizure of the appellant for questioning. *See United States v. Schneider, supra.*

We find that no error materially prejudicial to the substantial rights of the appellant was committed. The findings of guilty

and sentence, as approved on review below, are affirmed.

Senior Judge ABERNATHY and Judge BARR concur.