UNITED STATES, Appellee,

v.

**Welton J. SCOTT, Engineman Fireman Apprentice U.S. Navy, Appellant.**

No. 43,967.
NMCM 81–1257.

U.S. Court of Military Appeals.

Aug. 18, 1986.

For Appellant: *Captain David C. Larson*, JAGC, USN (argued); *Lieutenant Commander William A. DeCicco*, JAGC, USN.

For Appellee: *Lieutenant Commander John B. Holt*, JAGC, USN (argued); *Captain W. J. Hughes*, JAGC, USN (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

Notwithstanding appellant's pleas, a general court-martial convicted him of the premeditated murder of Yeoman Gary Smith, in violation of Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918, and sentenced him to a dishonorable discharge, life imprisonment, total forfeitures, and reduction to the lowest enlisted grade. After the convening authority approved the trial results and the Court of Military Review affirmed the findings and sentence, 13 M.J 874 (1982), this Court reversed that decision and remanded the case for further consideration in light of *United States v. Schneider*, 14 M.J. 189 (C.M.A.1982). 16 M.J. 449 (1983). On remand, the Court of

Military Review again affirmed the findings and sentence. 17 M.J. 724 (1983).

On appellant's petition from that decision, this Court granted review of the following issue:

WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW ERRED IN CONCLUDING THAT APPELLANT'S CONFESSION AND OTHER DERIVATIVE EVIDENCE WERE ADMISSIBLE OVER DEFENSE OBJECTION.

More specifically, appellant has asked us to determine the correctness of the decision on remand that he was not apprehended prior to his questioning by an investigative agent (17 M.J. at 726) and that, if he was, the agent had probable cause for the apprehension (*id.* at 727). *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *United States v. Schneider, supra.*

## I

A rather detailed recitation of the facts concerning the discovery and investigation of the homicide and the interrogation of appellant is a necessary predicate to resolving this appeal.

## A

At 2:26 a.m. on the morning of July 19, 1980, Yeoman Smith approached the gate to the Ship Repair Facility (SRF), a secure compound contained within the perimeter of the Naval Station, Guam. At the gate, Smith explained to the guard that he needed to enter in order to take his passengers to their ship, the USS KINKAID, which was making a brief port visit to the SRF. The guard noted either two or three other men in the car with Smith, at least some of whom were black. Also, the guard observed the odor of marihuana coming from the car and that the men in the car appeared to be intoxicated on some substance. After checking Smith's identification and requiring him to sign the entry log, the guard permitted the car to pass.

The guard remained at the gate until 3:45 a.m., when he began a roving patrol of the SRF. Around 5:20 a.m., he discovered Smith's body in the grass at the intersection of Main and D Streets. The body appeared to have several stab wounds in the chest, neck, and back. Subsequently, Smith was pronounced dead at the scene, with time of death medically estimated to have been between 3:30 and 4:40 a.m.

Smith's car was found nearby. In it, agents of the Naval Investigative Service (NIS) discovered a baggie of suspected marihuana, a cocaine spoon, and two pairs of men's sunglasses—one "hanging over the rearview mirror" and the other "in the glove compartment box." On the concrete slab of a nearby building investigators found a third pair of sunglasses, and they discovered a fourth pair and a set of keys "several yards" from the victim's body. "Both pair of glasses ... found outside ... the car were in and around areas where blood was present." Later, investigators learned that the pair on the concrete slab had belonged to Smith, but they were unable to identify positively the owner of the pair found near Smith's body.

Because Smith had indicated to the gate guard that his passengers were from the KINKAID and because no other living quarters or messing facilities were available on the SRF, the investigation focused on that ship's crew. Between 2:26 and 3:30, a number of people had returned to the KINKAID from liberty, including a number of black sailors. Interviews revealed that several of the black crewmembers had arrived back at the ship together, aboard a liberty bus, from a club on the Naval Station. After this group had arrived, the accused and a fellow crewmember named Gregory Price—neither of whom had been aboard the liberty bus with the others—crossed the quarterdeck of the KINKAID together at 3:00 a.m.

Witness interviews indicated to investigators that, after Price had boarded the KINKAID, he had gone to his locker and returned to the quarterdeck wearing "different" clothes—specifically, "a red tee-shirt ... worn inside-out." On the quarterdeck,

Price had requested a flashlight, saying that he had lost his wallet when he had exited the vehicle in which he had returned to the ship. A witness indicated that he then had seen Price leave the KINKAID with the flashlight and walk past the area of Building 21, which is near the ship, and toward the area of Building 2008, which lies in a line between the ship and the locations where Smith's body and car were found. The witness had lost sight of Price at that point.

Subsequently, NIS Special Agent Simon interviewed Price. Earlier witness interviews had indicated to investigators "that Price was a habitual wearer of sunglasses, that he all of the time he wore sunglasses, that during the day, during the night and that we tried through identification to find out what Price's sunglasses may or may not have looked like. Generally speaking the sunglasses found by the fire hydrant [near Smith's body] were similar to ones believed to belonging [sic] to Price." This background made it noteworthy to Simon that Price did not wear sunglasses during the interview. When asked about them, Price explained that he had lost them in New Guinea two weeks prior to the KINKAID's arrival in Guam.

Price stated that he and the accused had gone to a disco in a nearby town for the evening. When the disco had closed about 2:00 a.m., the two had returned to the SRF in "a taxi." Price said that, because he and the accused were inebriated and it was against ship regulations to board in that condition, they had walked around for a while "in the general area of Building 21" and had "smoked a marihuana cigarette to help clear their head." When they felt sober enough to board the KINKAID, Price said that he and Scott had crossed the quarterdeck and then had "parted company"—Price to his berthing space and, he assumed, Scott to his own. According to Price, when he later departed the ship to search for his wallet, he "never left" the area between the ship and Building 21—this statement, of course, being inconsistent with what another witness had told investigators earlier.

Concerning his relationship with the decedent, Price told Simon that he had met Smith about 10 days earlier at the Naval Station's gymnasium. He and Smith had chatted in Smith's car for about a half-hour about their home, which investigators inferred from Price's comment was on the East Coast. Simon testified that at the time this did not "ring true" to him for they had learned that, while Smith was from "New Jersey, which is obviously on the East Coast," Price was originally from Cleveland, Ohio, and had lived in California for the last couple of years before entering the Navy.

Investigators also learned that Price, the accused, and a shipmate named Maurice Sumler were friends and frequently went on liberty together when the KINKAID was in port. From witness interviews which corroborated each other, investigators were able to account for the activities during the relevant time frame of all the KINKAID's black sailors—including Sumler—except Price and Scott. Indeed, by reason of the interviews, "all but two people from the Kinkaid had been eliminated in [the investigators'] ... minds as suspects"—namely, Price and the accused.

Simon testified that, at this point in their investigation, they had identified several falsehoods which Price had related to them. First, Price had said that a couple of crewmembers, including Sumler, had seen him and Smith talking in Smith's car on the day the two had met; Sumler, however, had told investigators that he had not seen the two together. Second, Price had asserted that, on the night of the incident, he and the accused had taken the liberty bus from an on-base club to the International Trade Center in the local town and had walked from there to the disco; but, Simon—on the basis of his personal experience of driving or walking this distance at least a hundred times—knew that it was impossible to have traversed it in the length of time Price stated it had taken. Third, Price claimed that he had never left the area between the ship and Building 21 when looking for his

wallet and that he had "found his wallet in the vicinity of Building 21"; but a witness from the ship had seen him walk past Building 21 toward Building 2008, which was located between the ship and the places where Smith's body and car had been found. Fourth, Price had described his taxi driver "as a local, referring to a Guamanian"; however, the only taxi to have entered the gate in the relevant time frame was driven by a person named Yun—a name which, in Simon's experience, was Chinese or Korean and not Guamanian. Simon indicated that, because there are significant differences in the physical appearances of a Guamanian and an Oriental, Price's description of the driver as a "local" was logically inconsistent with the apparent Oriental origin of the only taxi driver to have entered the SRF during the relevant period of time. Moreover, Price was unable to describe the taxi, to relate any conversations with the driver while they were in the taxi, or to tell exactly what was the taxi fare which he had paid. Also, in Simon's opinion, Price was unable to give any logical explanation how he could have lost his wallet after leaving the taxi.

B

On the basis of his investigation to this point, Simon suspected Scott of involvement in the murder, along with Price, and decided to talk to him. In sending for the accused, Simon followed the procedure which had been coordinated with the commands of the KINKAID and the Naval Station and which had been followed with regard to three other witnesses from the ship after the on-site investigation at the SRF: A shore patrol vehicle and security personnel provided by the station would pick up the requested witness made available by the ship, transport the witness to the NIS office on the station, and return him to the ship.

Simon told no one about his suspicion of Scott. Instead, he simply asked Chief Waters, the assistant station security officer, to have appellant brought to the NIS office. Waters, in turn, told one of the security persons, a shore patrolman named Heim, to bring Scott in for questioning. At the ship Heim learned from Ah Nee, the Duty Master-at-Arms—who apparently was the KINKAID's point of contact in arranging for the witnesses—that appellant was at the beach onboard the station. Heim and Ah Nee then drove there in the shore patrol vehicle and found Scott. Ah Nee summoned him to the vehicle, checked his identification card, and told him that he must go to the NIS office. Appellant entered the vehicle without resistance, and the three drove to the NIS office.

There, Scott was told to have a seat in the waiting room, where Price, Sumler, and another witness also were seated. Ah Nee stood by the door. Waters went to another area of the office and told Simon that appellant had arrived.[1] About 10 minutes later Simon entered the waiting room and escorted Scott to an interrogation room.

At the outset, Simon advised Scott of his rights under Article 31, UCMJ, 10 U.S.C. § 831, and of his right to terminate the interview at any time. Nevertheless, appellant never asked for a lawyer or to terminate the questioning; and at all times he readily responded to Simon's questioning. Simon indicated at trial that, if Scott had indicated a desire "to terminate the interview," he would have done so promptly. However, the investigator also indicated that in that event he would not have permitted Scott simply to leave the office. Instead, consistent with his own usual procedure and the arrangements made with the KINKAID's command, Simon would have transported Scott back to the ship.

---

1. Some of the factual basis for the motion is taken from the Notice of Motion to Suppress (App. Ex. VIII), and the Government's Answer to Motion to Suppress (App. Ex. IX) states: "The facts are substantially as indicated in the defense motion, but with several variances." While we accept the uncontested statement of facts therein, it usually would be better practice to rely at trial only on stipulations or sworn testimony to provide the factual basis for resolution of motions regarding admissibility of evidence.

Indeed, Simon indicated that, if necessary, he "would have restrained" appellant for that purpose if he had attempted to leave on his own, even though Scott had been on liberty at the time he was brought to the office for questioning.

At the end of this interview, Simon asked appellant for permission to search his shipboard locker. Scott readily consented. Thereafter, he and Simon left for the KINKAID, along with another NIS agent who drove the vehicle, and with Price and Sumler, who were returning to the ship after their interrogations. At his locker, the accused pointed out the clothing he had worn the night before while on liberty. When Simon examined the denim jeans which appellant had identified, he discovered what appeared to be blood stains. Accordingly, Simon seized the jeans, returned Scott to his ship, and sent the jeans for lab analysis. When later that same evening the analysis confirmed Simon's suspicions, he questioned Scott a second time. On this occasion, appellant admitted his involvement with Price in Smith's murder.

## II

In *United States v. Schneider, supra* at 193, we outlined the following approach to cases like this:

[O]ur examination must begin, not end, with the determination that Article 31/ *Tempia* [16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967)] warnings have been properly given. After having crossed the "threshold requirement" of "voluntariness," we must look to the conditions surrounding the taking of the accused's confession to see if they amount to custodial interrogation. *Dunaway v. New York, supra,* 442 U.S. at 217, 99 S.Ct. at 2259. If the accused was in custody in terms of Article 7, we must test for probable cause to

justify the apprehension. *Cf. Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Next, if we conclude that the accused was held in custody without probable cause justifying his apprehension, we must examine "the causal connection between the illegality and the confession." *Brown v. Illinois, supra,* 422 U.S. [590] at 603, 95 S.Ct. [2254] at 2261[, 45 L.Ed.2d 416].... "... And the burden of showing admissibility rests, of course, on the prosecution." *Brown v. Illinois, supra,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62, quoted with approval in *Dunaway v. New York, supra,* 442 U.S. at 218, 99 S.Ct. at 2259. Should there be insufficient attenuation between the illegal custody and the confession flowing therefrom, the confession may not be admitted. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Dunaway v. New York, supra.*

### A

No controversy exists over whether appellant was properly and fully advised of his rights to silence, to the presence of an attorney, and to terminate the interrogation at any time. Neither is there dispute over whether the accused properly understood this advice nor whether he fully waived his rights and voluntarily answered Agent Simon's questions.

### B

"[H]aving crossed the 'threshold requirement' of 'voluntariness,'" we must look to the conditions surrounding the initial interview to see if appellant was under apprehension within the meaning of Article 7, UCMJ, 10 U.S.C. § 807.[2] *See United*

---

2. The precise definition of "apprehension" within the meaning of Article 7 need not concern us. The Supreme Court in *Dunaway v. New York,* 442 U.S. 200, 214, 99 S.Ct. 2248, 2257, 60 L.Ed.2d 824 (1979), made clear that, "whether or not it is technically characterized as an arrest," detention of a person beyond the brief stop-and-frisk situations blessed in *Terry v.*

*Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), or beyond the brief investigative stops "usually consum[ing] less than a minute and involv[ing] 'a brief question or two'" (442 U.S. at 210–11, 99 S.Ct. at 2255–56), approved in *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), "must be supported by probable cause," whether at the

*States v. Schneider, supra* at 193. The combination of several factors leads to an affirmative answer.

First, the Duty Master-at-Arms, accompanied by a uniformed shore patrolman in a shore patrol vehicle, approached appellant while he was on liberty at the beach and informed him that he must go to the NIS office for questioning. The Court of Military Review assumed that this statement was directive, and we see no reason to disregard or reject that assumption.

■ The court below found solace in concluding that Ah Nee, a "command representative, ... invoked command, vice law enforcement, authority" in so directing the accused. 17 M.J. at 726. However, someone having authority in the chain of command may perform law-enforcement functions, such as apprehension, with the same effect as if performed by a law-enforcement official. *See* Art. 7. Accordingly, the proper concern is not with the source of Ah Nee's authority but rather with the kind of authority he exercised over appellant that afternoon.

■ In light of Ah Nee's responsibility as Duty Master-at-Arms, appellant's being accompanied by a uniformed security person, their traveling in a marked shore patrol vehicle, and the order for Scott to accompany them to law-enforcement offices for interrogation, we conclude appellant was in custody.

The facts here are unlike those in *United States v. Sanford*, 12 M.J. 170 (C.M.A. 1981), where we ruled that a sergeant had not created a custodial situation by telling the accused that "Lieutenant Young wants to see you." That order was like any other military directive to report to a superior; there were no objective indicia to the accused of a law-enforcement purpose to the order; no one involved was a law-enforcement official or apparently exercising law-enforcement functions; and the order had a valid military purpose—achieving a drug-free unit—apart from any law-enforcement purpose.

Factors mentioned by the court below as indicative that Scott was not under apprehension—such as his not being advised by Ah Nee that he was a suspect, not being handcuffed, and not being frisk-searched—do not prevent our concluding that, in the environment already described, Scott was not free to decline the order and that the order clearly was given only for a law-enforcement purpose. As the Supreme Court admonished in *Dunaway v. New York, supra* 442 U.S. at 215, 99 S.Ct. at 2258, "form must not be exalted over substance" by seizing on the absence "of the trappings of a technical formal arrest."

Second, Simon suspected appellant of criminal conduct at the time he directed Waters to have Scott brought in for questioning; and the record leaves no doubt that Simon anticipated that, pursuant to his directive, appellant would be promptly produced for that purpose. This circumstance reenforces our view that Scott was within the custody of Ah Nee and Heim and that the reason for the restraint was related to law-enforcement, not to accomplishing a military mission.

Third, when Ah Nee delivered Scott to the NIS office, he remained in the waiting room with appellant and was positioned at the doorway. Although by itself not compelling, this fact further indicates that appellant's freedom of locomotion had been restricted to the limits determined by law-enforcement authorities. *See generally* para. 174 *d*, Manual for Courts-Martial, United States, 1969 (Revised edition) ("Custody ... may be corporeal and forcible or, once there has been a submission to apprehension or a forcible taking into custody, it may consist of control exercised in the presence of the prisoner by official acts or orders.").

---

"investigative" or at the "accusatory stage." 442 U.S. at 214, 99 S.Ct. at 2257. As the Court put it, "[C]ustodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." *Id.* at 216, 99 S.Ct. at 2258.

Fourth, although appellant was told that he could terminate the interview at any time, he never was advised that he then would be free to leave. If Scott had been so advised, the impact of other factors, such as Ah Nee's sentry-type position at the doorway, possibly would have been lessened; but the absence of such a communication could only heighten the objective implication of these other factors.

Indeed, Simon indicated at trial that appellant would not have been entirely free to leave even if he had asked to do so—that he would have taken whatever steps that were necessary to assure that Scott was escorted back to the KINKAID. Simon explained this restriction as being consistent with the arrangements made with the ship's command and with his own customary procedure of returning a witness to the command from whence he came. However reasonable this procedure might seem under other circumstances, it had a special significance as to appellant—who was not retrieved from his place of duty, but instead, when brought in, had been on liberty at the beach. Unless Simon had some reason to believe that Scott was not properly absent from his ship, no lawful basis existed for restricting appellant's freedom to leave the NIS office for any destination he chose. Because Simon knew that appellant was on liberty and lawfully away from his ship at the time he was picked up, the investigator's intended limitations on Scott's freedom to leave further indicate that the environment was custodial.[3]

All these circumstances—remarkably similar in important respects to those described by the Supreme Court in *Dunaway v. New York, supra* at 212, 99 S.Ct. at 2256—lead us to conclude that Scott was a suspect whose freedom of locomotion had been restricted more than momentarily for a law-enforcement purpose. Whatever label be attached, the reality is that Scott was being subjected to custodial interrogation.

As we recognized in *Schneider* :

"There are numerous situations in the military context where a military person is required to provide information to military authorities without consideration of the existence of probable cause to detain. [Citations omitted.] This may occur on the street, in offices, and in hearing rooms, as well as in places specifically provided for interrogation. And the obligation to report to such places for the purpose of giving such information, if properly related to the military mission, is a valid military duty."

14 M.J. at 192 (footnote omitted). This acknowledgment is consistent with our holding, in a related context, that a traditional military inspection is a reasonable intrusion into the privacy of a military person, although it might not be tolerated in a civilian environment. *United States v. Middleton*, 10 M.J. 123 (C.M.A. 1981). The supporting rationale in each instance is that the structured discipline and accountability in the military establishment has no real counterpart in the civilian community.

■ "However, we are not free to ignore the decisions of the Supreme Court, but must, instead, attempt to fit them into the context of military society." *United States v. Schneider, supra* at 193. Although a military inspection may be made for health and welfare purposes, "[a]n examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection" but a search, which must be predicated on probable cause. Mil.R.Evid. 313(b), Manual, *supra*. Likewise, without probable cause, an investigator may not detain a criminal suspect more than briefly for the purpose of interrogation.

---

3. Even though not communicated to Scott, Simon's intent provides a clue as to his own interpretation of the purpose and nature of his interview of appellant. That interpretation was probably reflected in other aspects of his conduct during the interview, as well. Of course, we are not asserting that an interview with a suspect is transformed into an apprehension merely because at some point the investigator believes that he has probable cause to apprehend and has made up his mind that he will do so.

## C

▮ Simon, however, had probable cause to apprehend the accused at this time. (1) Accompanied by men from the KINKAID, at least one of whom was black, the victim had entered the secure compound shortly before he met his death. (2) Because the KINKAID was then the only manned ship in the SRF and there were no other berthing or messing facilities aboard the SRF, crewmembers from the KINKAID would have been the only persons inside the secure compound at the early-morning time of Smith's death. (3) The whereabouts and activities of all those assigned to the KINKAID were accounted for, and corroborated, except for Price and the accused, both of whom are black. (4) Several facts strongly suggested that Price was involved in the murder. Sunglasses found near Smith's body were similar to those reportedly worn by Price virtually night and day; Price was not wearing sunglasses during his interview despite his reported habitual wearing of sunglasses; his version of his activities when he left the ship purportedly to look for his wallet was inconsistent with the account of an eyewitness, who had seen Price leave the area of the ship headed in the direction of the crime scene; Price's story of his first meeting Smith and of their conversation on that occasion did not fit what Simon already knew of that meeting; Price's version of his activities in town on the night of the murder was implausible in light of the time and distances involved; and his story of the return to the SRF in a taxi had a number of suspicious features. (5) Price and appellant were known to be close friends. (6) Both Price and appellant placed themselves in the company of each other from the moment they left the ship on liberty until they returned to it.

Given this combination of circumstances, we agree with the Court of Military Review that, at the time of appellant's apprehension, Simon had a "reasonable belief that an offense had been committed and that the person apprehended committed it." See Art. 7(b); 17 M.J. at 727. Because the investigator could have apprehended appellant, Scott has no complaint that the restraint on his freedom was in some respects less than could lawfully have been imposed. Accordingly, appellant's statement was not obtained by Special Agent Simon as the result or fruit of illegal conduct.

## III

The decision of the United States Navy-Marine Corps Court of Military Review is affirmed.

Judge COX concurs.

Judge SULLIVAN did not participate.