UNITED STATES, Appellee,

v.

Specialist Five Nancy J. VARRASO, SSN 029–50–3873, United States Army, Appellant.

CM 441203.

U. S. Army Court of Military Review.

8 March 1983.

Captain John D. Martin, JAGC, argued the cause for the appellant. With him on the brief were Colonel Edward S. Adamkewicz, Jr., JAGC, Major Raymond C. Ruppert, JAGC, Major James F. Nagle, JAGC, and Martin S. Cosgrove, Esquire.

Captain Gary L. Hoffman, JAGC, argued the cause for appellee. With him on the brief were Colonel R.R. Boller, JAGC, Lieutenant Colonel John T. Edwards, JAGC, and Captain Thomas E. Booth, JAGC.

Before MELNICK, McKAY AND LEWIS, Appellate Military Judges.

## OPINION OF THE COURT

McKAY, Judge:

This case is before the Court for mandatory review pursuant to Article 66, Uniform Code of Military Justice, Section 866, Title 10, United States Code (1976) (hereinafter UCMJ). The appellant, Specialist Five Varraso, was tried for premeditated murder. Convicted of unpremeditated murder, she was sentenced to reduction to the grade

of E–1, forfeiture of all pay and allowances, confinement for eight years and a dishonorable discharge. The convening authority approved the sentence. While the appellant asserts that numerous errors occurred at her trial, only the following contentions merit discussion. The first is the sufficiency of the evidence. The appellant also contends that the military judge erred by admitting her pretrial statement because it resulted from an illegal arrest, and also because agents of the Criminal Investigation Command (CID) failed to notify a defense counsel appointed to represent her in a prior CID investigation before her interrogation. The final significant issue is whether the military judge erred by refusing to give a defense requested instruction on intervening cause in the death of the victim by hanging. We disagree with the appellant's contentions and affirm the findings and sentence.

The evidence of record establishes that when Private First Class Tammy Meza-Luna failed to report at morning formation on 29 September 1980, her husband, a Specialist Five, began to search for her. He found her hanging by her neck from a rope around a tree limb in a secluded wooded area behind her unit's female barracks at Fort Story, Virginia. Tammy's body was leaning at an angle with her knees bent and her feet touching the ground. Tammy Meza-Luna was dead from strangulation.

Captain Wicinski, the company commander of both the decedent and the appellant, knew that the appellant was involved in a homosexual relationship with Becky Smith, another member of his unit;[1] that the appellant and the decedent had a confrontation and scuffle with Smith at an off-post residence a day or so earlier; that over the week-end Smith and the decedent had been found in the barracks naked in bed togeth-

---

1. Some two months before Meza-Luna's death, the appellant and Smith had advised the Captain of their homosexual relationship and that they wanted to be separated from the Army. He reported the matter to the CID, which completed an investigation of the matter prior to Meza-Luna's death. No charges were pre- ferred against either woman, however, an administrative elimination action was initiated. A defense counsel was appointed for the appellant with respect to this action. At least one CID agent involved in this first investigation was aware that the appellant was represented by legal counsel.

er; that the appellant had threatened anyone coming between her and Smith; that on the preceding day the appellant and the decedent were found in the wooded area behind the female barracks with a rope;[2] and that Meza-Luna's hands had been tied with a military type belt. After learning of Meza-Luna's death, Captain Wicinski restricted his unit, and at that time he also wanted to segregate the appellant from the other members. He was advised by the Provost Marshal, a personal friend, to send her to the Military Police (MP) station. Captain Wicinski ordered the appellant to be taken to the MP station by a warrant officer who was a member of the unit. The appellant waited at the MP station some five hours, but at no time was she told that she was under apprehension or arrest, nor was she placed in physical restraint. While not free to leave the station, she was allowed to move about it, use its facilities, and sleep on a bench in front of the desk sergeant. At about 2330 hours, 29 September, the appellant was taken from the MP station by CID agents to the Military Police Investigations office, the CID's base of operations for their investigation of Meza-Luna's death.[3]

After receiving advice with respect to her rights to counsel and under Article 31, UCMJ, 10 U.S.C. § 831 the appellant waived her right to counsel and after several hours of interrogation by the CID gave an oral statement that was subsequently reduced to writing and signed. In the statement the appellant said that at sometime during the evening of 28 September, Meza-Luna woke her up and pleaded for help to hang herself. The two of them then went to the same desolate wooded area where they had been seen in the afternoon with a rope. Once there, the appellant saw a rope with a noose hanging from a tree. At Meza-Luna's urging, the appellant tied Meza-Luna's hands behind her back with a military type belt and and put her head into the noose. According to the appellant's statement, she left the noose open enough for Meza-Luna to get her head out if she chose. The appellant then kissed Meza-Luna on the forehead and left her standing under the tree; she went back to her barracks and went to sleep.

■ Initially, we disagree with the contention of the appellant that the "evidence introduced at trial was insufficient to sustain a conviction for murder because it indicates that the decedent committed suicide." We find as a matter of fact that when the appellant securely tied Meza-Luna's hands behind her back, placed the noose over her head and left her alone in a secluded wooded area at night, she set into motion a chain of events that directly, or at least materially and substantially, caused Meza-Luna's death. We are convinced beyond a reasonable doubt that, contrary to the statement of the appellant, the evidence establishes that the noose was placed over Meza-Luna's head in a manner that precluded her from removing her head without assistance. Accordingly, Meza-Luna's fate was sealed when the appellant departed the scene leaving her helpless. It is immaterial whether Meza-Luna intentionally or accidentally slumped in the noose, or collapsed from weariness and fatigue, as either way the actions of the appellant caused her death.

2. From the record of trial it appears they contemplated a joint suicide but were prevented from doing so when they were discovered and ordered back to their barracks.

3. By 2330 hours, the CID case agent for the Meza-Luna investigation had evidence clearly indicating that someone besides the victim was involved in Meza-Luna's death because her hands were securely tied behind her back. He was also aware of the homosexual incident in the barracks involving Meza-Luna and Smith, the homosexual activities of Smith, Meza-Luna and the appellant, that the appellant had threatened anyone who came between Smith and herself and of the thwarted joint suicide attempt by the appellant and Meza-Luna. The CID also knew that when the appellant returned to Fort Story, after having spent the day of 29 September away, she told other members of her detail the deceased's identity after they learned a female in their unit had apparently committed suicide and before Meza-Luna's identity could have been made known to them.

The evidence therefore is sufficient to establish unpremeditated murder.

The appellant contends that her pretrial statement was erroneously admitted because it was the product of an illegal arrest that resulted when she was taken to the MP station. We disagree as we believe that any apprehension occurring at that time would have been made as a result of Captain Wicinski's order and that based upon the information he had there was probable cause for him to apprehend the appellant. We find, however, as did the military judge at the trial, that she was not apprehended until the CID picked her up at about 2330 hours at the station. After the discovery of Meza-Luna's body, Captain Wicinski had again placed his unit on restriction after having just removed it from that status because of another incident. There was some anger in the unit towards the appellant because of her presumed involvement in the death. Captain Wicinski was justifiably concerned not only for the safety of the appellant, but also for having her and other members of the unit available for the CID investigation. He was motivated to send her to the MP station, at the suggestion of his friend, the Fort Story Provost Marshal, in order to segregate her and allow for her to be watched. This was wise, appropriate and fully justified at the time. The MP station was merely a place of convenience to accomplish this legitimate obligation of a company commander. We find nothing unusual in this use of a police facility by a company commander on a small installation after normal duty hours. Military personnel have different obligations because of their military status and "the relationships inherent in a military organization are different from those of the [ordinary] citizen and the police". *United States v. Schneider,* 14 M.J. 189 (C.M.A.1982). Therefore, sending the appellant to the MP station has no more legal significance in this case, than had the commander sent her to a room in the barracks, the post library or any other convenient place to await developments in the on-going CID investigation.

The appellant also asserts, that because an attorney represented her in the CID investigation into her self-confessed homosexual activities and in the resulting on-going administrative elimination action, the failure to notify him prior to her interrogation in this case makes her statement inadmissible. She cites Military Rule of Evidence (MRE) 305(e) and *United States v. McOmber,* 1 M.J. 380 (C.M.A.1976).

The pertinent provisions of MRE 305(e) require that a person subject to the UCMJ, who intends to question another member suspected of an offense, and "knows or reasonably should know that counsel ... has been appointed for ... the ... suspect with respect to that offense, [must notify] the counsel ... of the intended interrogation", and counsel must be afforded an opportunity to be present before the interrogation may proceed. In our view, the plain wording of MRE 305(e) exempted any requirement for notice to the appellant's appointed counsel as the offense for which she was interrogated was different and unrelated to any for which the counsel had been appointed. That was the status of military law before MRE 305(e) became effective, *United States v. McDonald,* 9 M.J. 81 (C.M.A.1980), and is the law applied by the new rules. S. Saltburg, L. Schinasi, D. Schlueter, *Military Rules of Evidence Manual,* p. 95 (1981).

In determining whether offenses are different the Court of Military Appeals has been unwilling to require separation or to make subtle distinctions between offenses occurring in the same general area within a short period of time. *United States v. Lowry,* 2 M.J. 55 (C.M.A.1976). We do not appear to be faced with that type of a situation in this case. Here the first CID investigation had been completed, and although the record of trial does not indicate the report had been finalized, no charges were pending, and only an administrative separation of the appellant was in preparation. The second investigation related only to the death of Meza-Luna who apparently was uninvolved in the activities covered in

the first investigation.[4] The homosexual activities between the appellant and Smith investigated in the first investigation and the investigation of Meza-Luna's death were separated in time by two or more months, the decedent was not a subject in the first investigation, and Smith was not a subject in the second investigation. Considering these facts, we find that the time of occurrence, and the nature and gravaman of the offenses are separate, different, and therefore are unrelated except as to the existence of motive or the possibility thereof.[5] Accordingly, there was no requirement for the CID to have notified the appellant's appointed counsel before interrogating the appellant about Meza-Luna's death. We hold that the resulting statement was properly admitted at the trial of this case.

▪ The appellant also assigns as error the failure of the military judge to instruct the court on intervening cause even though, she asserts, that defense was raised and the instruction was requested. The substance of the requested instruction was that should the court members find that the deceased was in a secluded area in a position from which she could extricate or rescue herself, but intentionally slumped forward and killed herself, then that would be an intervening cause. At the time the instruction was requested, the military judge refused to give it pointing out that, for there to be an intervening cause, such cause must not be foreseeable. In other words, the military judge did not believe the defense of intervening cause had been raised by the evidence. We agree.

The intervening cause test requires that:
1. The injury or death resulted from an independent, intervening cause, and
2. The accused did not participate in the intervening cause, and

3. The intervening cause was not foreseeable.

40 Am.Jur.2d, Homicide § 17; *United States v. King*, 4 M.J. 785 (N.C.M.R.1977); *United States v. Eddy*, 26 C.M.R. 718 (A.B.R.1958); *see United States v. Houghten*, 13 U.S.C.M.A. 3, 32 C.M.R. 3 (1962) (Ferguson, J., dissenting). Assuming that the decedent did intentionally slump forward, thus tightening the noose around her neck and thereby strangle, we find that to have been foreseeable by the appellant. The appellant knew that Meza-Luna had a recent marital dispute, had left her husband and moved into the barracks, was upset with respect to her homosexual involvement with Smith, had indicated an intention to commit suicide on more than one recent occasion, and in fact, with the appellant herself, had engaged in two abortive attempts to commit suicide that afternoon. Finally, Meza-Luna had awakened the appellant and enticed her to the desolate wooded area for the stated purpose of assisting her to commit suicide. Even the appellant's statement upon which she relies as establishing the defense of intervening cause when considered in its entirety, belies her insistence that she did not believe Meza-Luna intended to kill herself. Moreover, if strangulation resulted from an accidental fall or from fatigue, the result is the same as both situations were foreseeable under the circumstances. While an accused is entitled to have instructions relating to any defense theory raised by the evidence, *United States v. Bellamy*, 15 U.S.C.M.A. 617, 36 C.M.R. 115 (1966), a requested instruction is properly rejected if the evidence does not sustain it. *State v. Glover*, 330 Mo. 709, 50 S.W.2d 1049 (1932), Annot., 87 A.L.R. 400. We hold the military judge correctly found the defense of intervening cause not to have been raised by the evidence and therefore properly rejected the requested instruction.

---

4. During her interrogation the appellant was asked whether there were homosexual activities between herself and the victim and if she knew of the barracks incident in which the decedent had been seen naked in bed with Smith. We believe these questions were intended to ascertain only whether there was motive for the appellant to have killed Meza-Luna.

5. Knowledge of the Varasso-Smith homosexual relationship and the appellant's statement threatening anyone coming between them was one fact that determined probable cause to arrest the appellant by the CID. This involved possible motive also.

We have considered the other matters raised by the appellant and find them to be without merit.

The findings of guilty and the sentence are affirmed.

Senior Judge MELNICK and Judge LEWIS concur.