**William R. JEFFERSON, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 03–1721 C.**

United States Court of Federal Claims.

April 28, 2004.

William R. Jefferson, Randolph AFB, TX, pro se.

Douglas K. Mickle, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and James M. Kinsella, Deputy Director, Civil Division, U.S. Department of Justice, Washington, DC for defendant. Lt. Col. P. Christopher Clark, General Litigation Division, Air Force Legal Services Agency, Arlington, VA, of counsel.

## OPINION

HEWITT, Judge.

Before the court is Defendant's Motion to Dismiss, and in the Alternative, Motion for Judgment upon the Administrative Record (Def.'s Mot. or defendant's motion). The motion has been fully briefed.[1] For the rea-

---

1. Other filings include the Complaint (Compl.), Administrative Record (AR) filed by defendant, Defendant's Statement of Facts (Def.'s Facts), plaintiff's Response to Defendant's Motion to

sons discussed below, defendant's motion for judgment upon the administrative record is GRANTED.

## I. Background

The pertinent facts in this case are not in dispute.[2] Plaintiff is an active-duty member of the United States Air Force. Def.'s Facts ¶ 1. Plaintiff, a noncommissioned officer, held the rank of technical sergeant (E–6) at the time he was the subject of an Air Force Office of Special Investigations (OSI) investigation in April 1999, an investigation triggered by a complaint from a civilian that plaintiff and a male airman had raped a female airman. *Id.* ¶¶ 2, 5; Compl. at 2.

During the investigation by Special Agent Brian D. Medley of OSI, plaintiff was summoned for an interview. Def.'s Facts ¶ 4; AR at 44. After some questioning he requested counsel. Def.'s Facts ¶ 4. Thereafter, the interview was terminated. *Id.* After being fingerprinted and photographed, plaintiff stated he wanted to leave the OSI building, but was ordered by Special Agent Medley to remain until released to his First Sergeant. *Id.* Plaintiff disobeyed the order to stay seated, and once he left the building, he also disobeyed the order by another Special Agent to return to the OSI building. *Id.;* AR at 43, 45, 48, 50. Plaintiff was then informed that he was "under apprehension," was handcuffed, and was returned to the OSI

building. Def.'s Facts ¶ 4; AR at 43, 45, 48, 50.

Plaintiff was not ultimately tried for rape, but for disobeying the order given by Special Agent Medley to remain at the OSI building, and for two fraternization charges based on allegations of sexual intercourse with the female airman and "partying" with the male airman. AR at 90. Plaintiff was considered for nonjudicial punishment under Article 15, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 815 (2000).[3] Def.'s Facts ¶ 5. Punishment was considered for charges of "Failure to obey other lawful order," Article 92, UCMJ, and "Fraternization," Article 134, UCMJ.[4] AR at 11; Def.'s Facts ¶ 5; *see also* 10 U.S.C. §§ 892, 934 (2000). The punishment plaintiff received was a reduction in rank, E–6 to E–5, and a reprimand. Def.'s Facts ¶ 5.

The Article 15 punishment was upheld on appeal, and placed in an Unfavorable Information File (UIF) in plaintiff's military records. *Id.;* AR at 174. Upon plaintiff's request for removal of the Article 15 and UIF from his records, restoration of rank and back pay, the Air Force Board for Correction of Military Records (AFBCMR) on September 21, 2000 recommended that plaintiff's records be corrected to give plaintiff the " 'partial relief' " of removing that portion of the Article 15 punishment related to fraternization and removing the reprimand.[5] Def.'s Facts ¶¶ 6, 8 (quoting AR at 6); Def.'s Mot.

Dismiss, and Motion for Judgment upon the Administrative Record (Pl.'s Resp.), Plaintiff's Counter–Statement of Facts (Pl.'s Facts) and Defendant's Reply to Plaintiff's Response to Defendant's Motion to Dismiss, and in the Alternative, Motion for Judgment upon the Administrative Record (Def.'s Reply).

**2.** Facts cited to only one party in this opinion are uncontroverted. Plaintiff does not dispute any of the facts, as stated by defendant, related to the investigation that preceded his nonjudicial punishment by the Air Force. Pl.'s Facts ¶ 4. Plaintiff does dispute certain underlying facts that gave rise to the investigation, and disputes the legal import of the Air Force's actions during the investigation, punishment and review of his punishment. *See generally id.*

**3.** "In the Uniform Code of Military Justice Congress has set forth four methods for disposing of cases involving offenses by servicemen: the gen-

eral, special, and summary courts-martial and disciplinary punishment administered by the accused's commanding officer pursuant to Article 15, UCMJ. . . . Article 15 nonjudicial punishment, UCMJ, is the least formalized method of discipline, conducted personally by the accused's commanding officer." *Dumas v. United States,* 223 Ct.Cl. 465, 620 F.2d 247, 251 (1980) (citations and footnote omitted).

**4.** The fraternization charges stated that plaintiff acted "as prohibited by Air Force Instruction 36–2909 paragraph 3.6, in violation of the custom of the United States Air Force that noncommissioned officers shall not fraternize with enlisted persons on terms of military equality." AR at 90.

**5.** The bar on fraternization between noncommissioned officers and enlisted personnel was found to be unsupported by regulation, case law or Air Force custom. AR at 84.

at 2–3. "On September 21, 2000, Joe G. Lineberger, Director of the Air Force Review Boards Agency, directed that [plaintiff's] records be corrected by implementing the AFBCMR's recommendations." Def.'s Facts ¶ 8; AR at 1.

Upon plaintiff's request for reconsideration of the AFBCMR decision to uphold the punishment of reduction in rank for disobeying a lawful order, on December 15, 2000 the AFBCMR denied plaintiff's request stating that "[r]econsideration is authorized only where newly discovered relevant evidence is presented which was not available when the application was submitted. The reiteration of facts previously addressed by the Board, uncorroborated personal observations, or additional arguments on the evidence of record are not adequate grounds for reopening a case." AR at 142; see also Def.'s Facts ¶ 9; AR at 138. Plaintiff again applied to the AFBCMR, requesting that his records be corrected to remove the entirety of the Article 15 punishment, that the board restore his rank and award back pay and that he "receive supplemental board consideration for promotion to the grade of master sergeant (E–7)." AR at 174; see also Def.'s Facts ¶ 10. After obtaining legal opinions from the Air Force Legal Service's Agency Military Justice Division (JAJM) regarding plaintiff's legal arguments, the majority of the AFBCMR board found "insufficient evidence of error or injustice and recommend[ed] the application be denied." AR at 177; see also Def.'s Facts ¶¶ 7, 10–12, 14. Mr. Lineberger accepted the majority recommendation on July 24, 2002 and denied plaintiff's application, concurring in their finding that "relief is not warranted." AR at 173.

Plaintiff filed his complaint in this court on July 17, 2003, requesting that the court

> [a]mend [his] military records by removing in its entirety the Article 15, reinstate [him] to the grade of E–6 with an effective date of 1 May 1994, order [him] to meet a supplemental promotion board for the grade of E–7, order the payment of all lost pay and allowances suffered as a result of the Article 15 punishment, and order any further relief the Court deems reasonable and necessary.

Compl. at 6. Defendant moved, on October 15, 2003, to dismiss plaintiff's claims based on Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), "failure to state a claim upon which relief can be granted," RCFC 12(b)(6), and, in the alternative, for judgment upon the administrative record pursuant to RCFC 56.1. Def.'s Mot. at 1, 4, 10.

## II. Discussion

### A. Standard of Review

The Tucker Act gives this court jurisdiction to "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department." 28 U.S.C. § 1491(a)(1) (2000). In order to invoke Tucker Act jurisdiction, a "plaintiff must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States." James v. Caldera, 159 F.3d 573, 580 (Fed.Cir.1998). Active-duty members of the armed services are entitled to their pay by statute. See 37 U.S.C. § 204(a)(1) (2000) ("The following persons are entitled to the basic pay[:] . . . a member of a uniformed service who is on active duty . . . ."); Palmer v. United States, 168 F.3d 1310, 1314 (Fed.Cir.1999) ("By virtue of their status, arising from full-time active duty service, they are entitled to the pay and allowances attributable to their rank and station.") "If [full-time active duty service members] are wrongfully denied the benefits of that status, they have a cause of action under the Tucker Act; section 204(a)(1) is money-mandating." Palmer, 168 F.3d at 1314.

"In evaluating [a Rule 12(b)(6)] motion, the court must accept all well-pled factual allegations as true and draw all reasonable inferences in the plaintiff[']s favor." Ainslie v. United States, 355 F.3d 1371, 1373 (Fed. Cir.2004). "Dismissal for failure to state a claim under Rule 12(b)(6) is proper only when a plaintiff 'can prove no set of facts in support of his claim which would entitle him to relief.'" Leider v. United States, 301 F.3d 1290, 1295 (Fed.Cir.2002) (quoting Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2

L.Ed.2d 80 (1957)), *cert. denied,* 538 U.S. 978, 123 S.Ct. 1786, 155 L.Ed.2d 666 (2003). In deciding a motion filed under RCFC 12(b)(6), " 'pleadings drafted by *pro se* plaintiffs are held to a less stringent standard than pleadings drafted by attorneys.' " *Deason v. United States,* 57 Fed. Cl. 266, 268 (quoting *Thomas v. United States,* 56 Fed.Cl. 112, 114 (2003)), *aff'd,* 83 Fed.Appx. 332 (2003). If "matters outside the pleading are presented to and not excluded by the court, the [RCFC 12(b)(6)] motion shall be treated as one for summary judgment." RCFC 12(b).

"Motions for judgment on the administrative record filed pursuant to Rule 56.1 of the Rules of the United States Court of Federal Claims (RCFC) are reviewed under the same standards as motions for summary judgment." *Eisenhuth v. United States,* 59 Fed. Cl. 460, 462 (2004). Summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting the almost identical language of Rule 56(c) of the Federal Rules of Civil Procedure). "[A]ll evidence must be construed in the light most favorable to the party opposing summary judgment." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 601, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, "[a] nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." *Dairyland Power Coop. v. United States,* 16 F.3d 1197, 1202 (Fed.Cir. 1994).

### B. Analysis

#### 1. Justiciability

Defendant argues that plaintiff's complaint should be dismissed because plaintiff's claims are nonjusticiable. Def.'s Mot. at 7, 9. Defendant asserts that plaintiff has failed to allege any claim that falls within the scope of review of this court. *Id.* at 7–9. Plaintiff,

proceeding pro se, has alleged facts concerning his reduction in grade from E–6 to E–5 and lost pay. Complaint (Compl.) at 1–6. Plaintiff has also alleged that the Air Force violated Article 9, UCMJ, 10 U.S.C. § 809 (2000), Compl. at 3, violated his rights under the Fourth Amendment of the Constitution of the United States, *id.* at 3–4, that the Article 15 punishment was "wrongfully issu[ed]," Pl.'s Resp. at 3, and that the AFBCMR result was "contrary to law and regulation," Compl. at 1. "Because granting [a RCFC 12(b)(4), now RCFC 12(b)(6) motion,] summarily terminates the case on its merits, courts broadly construe the complaint, particularly in light of the liberal pleading requirements under the Federal Rules of Civil Procedure." *Ponder v. United States,* 117 F.3d 549, 552–53 (Fed.Cir.1997).

■ This court must abstain from reviewing military decisions when those decisions are beyond the competence of civilian judges. *See Sargisson v. United States,* 913 F.2d 918, 921 (Fed.Cir.1990) (stating that a personnel decision taken by the Secretary of the Air Force's is "beyond the ken of judicial competence; it is nonjusticiable"); *Murphy v. United States,* 993 F.2d 871, 873 (Fed.Cir. 1993) ("We have emphasized that judicial review is only appropriate where the Secretary's discretion is limited, and Congress has established 'tests and standards' against which the court can measure his conduct.") (quoting *Sargisson,* 913 F.2d at 922). But even where Congress gives the military unlimited discretion, military regulations provide an "inherent" test or standard against which the court can measure the military's conduct. *Murphy,* 993 F.2d at 873. This court thus has the power to decide "whether [military] procedures were followed by applying the facts to the statutory or regulatory standard." *Id.* Because Article 15 proceedings are governed by statute and regulation, *see* 10 U.S.C. § 815 (governing non-judicial punishment in the armed forces); *Manual for Courts–Martial, United States* Part V (2002 ed.) (same), they are amenable to review in this court.

■ This court also has the power to review Article 15 disciplinary proceedings for

violations of constitutional rights. *See Dumas v. United States*, 223 Ct.Cl. 465, 620 F.2d 247, 254 (1980) (finding "sufficient probable cause" to bring military detention and search "within constitutional limits" without reaching question of whether Fourth Amendment was applicable to Article 15 non-judicial punishment proceedings); *Hagarty v. United States*, 196 Ct.Cl. 66, 449 F.2d 352, 362 (1971) (stating that the Court of Claims' review of an Article 15 proceeding "might also extend to flagrant violations of due process which would raise questions which 'rise to the constitutional level' " but not reaching the question (quoting *United States v. Augenblick*, 393 U.S. 348, 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969))); *Cochran v. United States*, 1 Cl.Ct. 759, 765–66 (1983) (*Cochran I*) ("In a suit seeking to overturn nonjudicial punishment imposed under Article 15, this court's jurisdiction is limited to cases involving money claims founded upon allegations of lack of compliance with the requirements of the statute, the controlling regulations and the Constitution."); *see also Jamison v. United States*, 5 Cl.Ct. 747, 750 (1984) (citing *Dumas* and *Cochran I* as support for the statement that "the [Claims Court's] review of Article 15 proceedings was limited to determining whether there had been 'compliance with controlling regulations' and the Constitution to avoid prejudice to the alleged offender" (quoting *Dumas*, 620 F.2d at 250)), *aff'd*, 765 F.2d 159 (Fed.Cir.1985).

Although this court has the power to review military decisions and actions as noted above, the scope of that review is limited. *See id.* (stating that "the scope of [the Claims Court's] review of [Article 15] proceedings [is] extremely limited"). Defendant argues that this court may review procedural defects in a military disciplinary process, but a civilian court "should not review the substantive decisions of commanders pursuant to nonjudicial proceedings." Def.'s Mot at 7, 9.

The Federal Circuit has emphasized the distinction between substance and procedure when describing this court's scope of review of military promotion and retention decisions. *See Godwin v. United States*, 338 F.3d 1374, 1378 (Fed.Cir.2003) (stating that military promotion decisions themselves are nonjusti-ciable but that "procedural violation[s in the military promotion process] may be justiciable"); *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed.Cir.2002) (stating in a promotion and retention case that "[w]here ... review is sought not of the substance of a military decision, but instead its compliance with an applicable statute or regulation, we have not abstained from review"); *Adkins v. United States*, 68 F.3d 1317, 1318–20, 1323 (Fed.Cir.1995) (stating, in a promotion and retention case, that "although the *merits* of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular *procedure* followed in rendering a military decision may present a justiciable controversy"); *Murphy*, 993 F.2d at 873–74 (stating, in a retention case, that "the merits of the Air Force's decision to release Murphy from active duty are beyond judicial reach" and that the court "merely determines whether the procedures were followed by applying the facts to the statutory or regulatory standard"). *But see Murphy*, 993 F.2d at 873 (stating that "the utility of the distinction between procedural and substantive matters in assessing a court's ability to review military decisions should not be overemphasized").

Although the distinction between substance and procedure has been infrequently mentioned in this court's review of disciplinary proceedings under Article 15, the scope of review of this court "is not ... to review the merits of findings of guilt in Article 15 punishment proceedings, but only the disregard or violation of the Constitution, statute or regulations in the conduct of the proceedings." *Cochran I*, 1 Cl.Ct. at 770; *see Dumas*, 620 F.2d at 250 (reviewing Article 15 proceedings and finding that "all pertinent regulations were complied with by the Air Force" and that "plaintiffs' constitutional rights were observed"); *Hagarty*, 449 F.2d at 362 (reviewing Article 15 proceedings and finding that Article 15 and "procedural regulations" had been violated); *Conn v. United States*, 180 Ct.Cl. 120, 376 F.2d 878, 881 (1967) (reviewing Article 15 proceedings and finding "noncompliance with controlling regulations"); *Jamison*, 5 Cl.Ct. at 750–51 (reviewing Article 15 proceedings

for three allegations of procedural error); *see also Cochran v. United States,* 3 Cl.Ct. 3, 4 (1983) (*Cochran II*) (finding, upon motion for rehearing, that plaintiff's contentions of "factual matters related to the claim of bias" and "an issue of credibility" were beyond the scope of review of this court, and that the "resolution of such matters was for the military reviewing authorities and not this court").

Defendant argues that plaintiff has "fail[ed] to allege ... any relevant procedural violations on the part of his command, the Air Force staff agencies, or the AFBCMR." Def.'s Mot. at 9. The court reads plaintiff's complaint and briefing differently.

There are three actions by the Air Force that are challenged in plaintiff's complaint and subsequent briefing: the order by Special Agent Medley to Mr. Jefferson to "remain in the OSI building," Compl. at 3, the Article 15 non-judicial punishment received for failing to obey that order, Compl. at 3; Pl.'s Resp. at 3, and the AFBCMR final decision denying plaintiff's request to remove the Article 15 punishment from his military records and for other relief, Compl. at 1, 6. For plaintiff's claims concerning these actions to be justiciable, plaintiff must allege facts that constitute a "disregard or violation of the Constitution, statute or regulations in the conduct of the proceedings." *Cochran I,* 1 Cl.Ct. at 770. The court will review each of the Air Force actions challenged by plaintiff in turn.

 Logically, investigation of the charges is part of the conduct of an Article 15 proceeding and is amenable to review by this court. *See Dumas,* 620 F.2d at 254 (reviewing whether the automobile search that triggered the Article 15 punishment was "within constitutional limits" but not reaching the question whether such a review was required); *Cochran I,* 1 Cl.Ct. at 766–69 (reviewing several aspects of the preliminary investigation that resulted in Article 15 punishment). Special Agent Medley's order, which took place during the preliminary investigation for an Article 15 proceeding, *see* Def.'s Facts ¶ 4; Pl.'s Facts ¶ 4 (showing that plaintiff was attempting to leave the OSI building after his interview had been termi-

nated upon his request for counsel, when he disobeyed a direct order to wait until his First Sergeant arrived to escort him), must be reviewed for the violations of Article 9 of the UCMJ alleged by plaintiff, *see Cochran I,* 1 Cl.Ct. at 770 (stating that the court's function is to review violations of statute or regulations), and may be reviewable for Fourth Amendment rights violations alleged by plaintiff, *Dumas,* 620 F.2d at 250, 253–54. Although this court may find that, as a matter of law, the facts alleged do not justify plaintiff's claims, the Air Force's compliance with procedural regulations, statutes and applicable constitutional norms in issuing the order to remain in the OSI building is justiciable. *See Cochran II,* 3 Cl.Ct. at 4 (stating that the Claims Court's "function in this case is limited to ascertaining whether or not there has been 'disregard or violation of the Constitution, statute or regulations in the conduct of the [Article 15] proceedings'" (quoting *Cochran I,* 1 Cl.Ct. at 770)).

Beyond the challenge to Special Agent Medley's order, plaintiff has cited no facts and no regulation, statute or constitutional provision in support of his contention that the Article 15 punishment was "wrongly issu[ed]" by the Air Force. Pl.'s Resp. at 3. Defendant claims that plaintiff "only asserts his disagreement with the ultimate finding of guilt at the end of the process," not the conduct of the proceedings. *See* Def.'s Reply at 4 (stating that plaintiff "nowhere ... point[s] to any procedural error in the conduct of his Article 15 proceedings"). The court has found no case in which this court has reached the merits of an Article 15 punishment decision and agrees with defendant that only procedural errors in Article 15 proceedings are within this court's scope of review. Def.'s Mot. at 7–8; *see Cochran I,* 1 Cl.Ct. at 770 (stating that the role of this court is "not ... to review the merits of findings of guilt in Article 15 punishment proceedings"). The court also agrees with defendant's assertion that the lawfulness of military orders is not, generally, a justiciable issue in this court. Def.'s Mot. at 5–6; *see Orloff v. Willoughby,* 345 U.S. 83, 88, 94, 73 S.Ct. 534, 97 L.Ed. 842 (1953) (stating that "we have found no case where this Court has

assumed to revise duty orders as to one lawfully in the service," despite the fact that "the statute should be interpreted to obligate the Army to classify specially inducted professional personnel for duty within the categories which rendered them liable to induction"); *Martin v. Mott*, 25 U.S.(12 Wheat.) 19, 30–31, 6 L.Ed. 537 (1827) (stating that if "any act done by [an officer to muster the militia] would subject him to responsibility in a civil suit, ... [s]uch a course would be subversive of all discipline, and expose the best disposed officers to the chances of ruinous litigation").

But the court reads plaintiff's complaint to attack the procedure employed in the investigation phase of the Article 15 proceedings, not to attack the merits of the punishment decision relating to disobeying a direct order. *See* Compl. at 4 ("I assert the order issued by [Special Agent] Medley ... was an unlawful order because the order deprived me of my constitutional and statutory rights under the Fourth Amendment to the Constitution and Article 9, UCMJ, not to be arrested without probable cause."). In fact, nowhere in plaintiff's pleadings does plaintiff request that this court review the merits of the Article 15 punishment decision. Because plaintiff's challenge is based solely on the procedure used in the Air Force's investigation, the court finds that plaintiff's claims relating to the Article 15 action are justiciable.

█ Lastly, plaintiff contends that "the [AFBCMR's final] decision was contrary to law and regulation." *Id.* at 1. Plaintiff contests the merits of the AFBCMR's final deci-

sion, not the conduct of the proceedings. *Id.* at 3, 6. Plaintiff asserts that the AFBCMR committed legal error in its review of Special Agent Medley's order and the Article 15 punishment. *Id.* at 1, 3–4; Pl.'s Resp. at 1–3. The scope of review for challenges to military correction boards in this court is " 'limited to determining whether a decision of the Correction Board is arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations.' " *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed.Cir.1983) (quoting *de Cicco v. United States*, 230 Ct.Cl. 224, 677 F.2d 66, 70 (1982)). The court believes that plaintiff has alleged error in the AFBCMR decision that, if substantiated, might meet the "substantial evidence" standard of review. Therefore, the court finds that the AFBCMR final result is also justiciable.[6]

Because plaintiff's claims are justiciable, the court DENIES defendant's motion to dismiss, and now turns to the analysis of defendant's motion for judgment upon the administrative record.

### 2. Judgment on the Administrative Record

Plaintiff alleges only one procedural flaw in his Article 15 punishment: plaintiff claims that Special Agent Medley's order to remain at the OSI building was contrary to Article 9 of the UCMJ and the Fourth Amendment. Compl. at 4. Plaintiff asserts that Special Agent Medley's order caused plaintiff to be "arrested without probable cause." *Id.* The AFBCMR, in reviewing this issue, came to a different conclusion:

**6.** Defendant argues that this case fundamentally concerns the lawfulness of military orders, and that such an issue is nonjusticiable. Def.'s Mot. at 9. Even if defendant's analysis were correct, the correction board decision might still be justiciable. The court has found no precedent, and the parties have indicated none, that decides whether this court may review a Board of Correction of Military Records decision if the underlying military actions are nonjusticiable. This court has stated that routing a challenge to a military action through a board of correction of military records does not confer jurisdiction in this court where there was none before. *Flute v. United States*, 210 Ct.Cl. 34, 535 F.2d 624, 629 (1976) ("Plaintiff conceded that he could not by routing his case via the Correction Board to this court, confer on us jurisdiction to reverse the

court-martial conviction for errors of a nature we could not, under *United States v. Augenblick*, [393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969)], review if the case came to us otherwise."). This court has also stated that a military correction board decision is justiciable even where the underlying military personnel decision is entirely discretionary. *Krauss v. United States*, 40 Fed.Cl. 834, 839 (1998) ("It is well established that the legal sufficiency of a BCNR [Board for Correction of Naval Records] decision presents a justiciable issue, even if the challenged BCNR decision relates to a purely discretionary military decision like the fitness for duty of a servicemember."). The court does not attempt to resolve this question, but raises the point as another potential justification for the justiciability of plaintiff's claims.

We carefully considered the evidence provided by the applicant and the arguments opined by his counsel that the order given by the OSI agent was illegal and unlawful because it amounted to an arrest without probable cause. In deference, the majority of the Board agrees with the opinion of the Associate Chief, Military Justice Division [ (JAJM) ], that the order given to the applicant was both lawful and reasonable and was not contrary to established law or regulation. Accordingly, the Board majority finds no basis upon which to favorably consider [plaintiff's] request [to remove the Article 15 punishment from plaintiff's records and to provide other relief].

AR at 176. This court reviews the AFBCMR decision to see whether it was "arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations." *Heisig,* 719 F.2d at 1156 (quotation omitted).

a. Whether Article 9, UCMJ, Was Violated by Special Agent Medley's Order

■ Plaintiff's claim that Special Agent Medley's order violates Article 9, UCMJ, is predicated on plaintiff's characterization of that order as an arrest, and that arrests under Article 9, UCMJ require probable cause. *See* Compl. at 2 (stating that "the crux of my prior submissions to the [AFBCMR] was that the order was contrary to Article 9, UCMJ, in that the order was an action being, or tantamount to an arrest without probable cause"); *id.* at 3 (stating that "I believed the ... order to remain in a specific place was an arrest, since it directed me to remain within a specified area and limited my ability to freely leave and restrained my movement"). Plaintiff cites the text of Article 9, UCMJ, in support of this characterization: "'Arrest is the restraint of

a person by an order ... directing him to remain within specified limits.'" *Id.* at 4 (quoting 10 U.S.C. § 809(a)). An arrest under Article 9, UMCJ, does require probable cause. *See* 10 U.S.C. § 809(d) ("No person may be ordered into arrest or confinement except for probable cause."). If plaintiff's characterization of Special Agent Medley's order is correct, the court might be required to test that order for probable cause.[7]

Special Agent Medley's order to remain in the OSI building until plaintiff's First Sergeant arrived to escort him was not an arrest, however. The term "'arrest' in military law is a term of art." *United States v. Harris,* 29 M.J. 169, 170 (C.M.A.1989). Arrest is one of four types of pretrial restraint used by the military to restrict the movement or other actions of service members facing charges. *See* 10 U.S.C. § 810 (2000) ("Any person subject to this chapter charged with an offense under this chapter shall be ordered into arrest or confinement, as circumstances may require .... When any person subject to this chapter is placed in arrest or confinement prior to trial, immediate steps shall be taken to inform him of the specific wrong of which he is accused and to try him or to dismiss the charges and release him."); Rules for Courts–Martial (R.C.M.) 304(a) ("Pretrial restraint is moral or physical restraint on a person's liberty which is imposed before and during disposition of offenses. Pretrial restraint may consist of conditions on liberty, restriction in lieu of arrest, arrest, or. confinement."). Special Agent Medley's order was not imposed for the purpose of restraining someone who had been "charged with an offense," 10 U.S.C. § 810, and who was awaiting trial. The court finds that Special Agent Medly's order could not have violated Article 9, UCMJ, because it was not an "arrest"[8] or a confinement,[9] which are the only restraints governed by Article 9, UCMJ.

7. Before this court would inquire into the existence of probable cause, it would first determine whether this issue had been the subject of fact-finding in the Article 15 proceeding, in its appellate review and before the AFBCMR. In this court's review of military courts-martial, at least, the issue of sufficient probable cause is a question of fact and a military court's determination of probable cause is normally conclusive. *See Bowling v. United States,* 713 F.2d 1558, 1562 (Fed.Cir.1983) (stating that where "[l]ack of probable cause was raised and argued in the

proceedings all the way up to and including the Court of Military Appeals and the contention was rejected" the "adverse fact-finding there [in military courts] is conclusive now"). The court does not need to decide how it would, or even if it could, review probable cause in this case, however.

8. An arrest is more extensive than what occurred here. It is a restraint where the accused "may not be required to perform full military duties such as commanding or supervising personnel,

**b. Whether Article 7, UCMJ, Was Violated by Special Agent Medley's Order**

■■ Although plaintiff did not directly allege that Special Agent Medley's order violated Article 7, UCMJ, this court holds a pro se plaintiff's complaint to "a less stringent standard." *Deason,* 57 Fed.Cl. at 268 (quotation omitted). Plaintiff did state that these facts were "more equivalent to an arrest; but, might be considered an apprehension," that "[a]pprehension is the equivalent of civilian arrest," and that "an apprehension, like an arrest, must be based on probable cause." Compl. at 4. Plaintiff also cited to R.C.M. 302, *id.,* the rule that defines apprehensions in military law and that states the requirement for probable cause, *see* R.C.M. 302(a)(1) ("Apprehension is the taking of a person into custody."); R.C.M. 302(c) ("A person subject to the code[10] or trial thereunder may be apprehended for an offense triable by court-martial upon probable cause to apprehend."). Plaintiff's indirect allegation has been fully addressed by both defendant and the AFBCMR, Def.'s Mot. at 11–14; AR at 164–65, 176. The court reviews plaintiff's indirect allegation of an Article 7, UCMJ, violation to see if Special Agent Medley's order was an apprehension under Article 7, UCMJ. If plaintiff's indirect allegation that an apprehension occurred is correct, the court might be required to test such an apprehension for probable cause.[11]

Article 7, UCMJ, simply states that "[a]pprehension is the taking of a person into custody." 10 U.S.C. § 807 (2000). "In military law, [apprehension] is the equivalent of an arrest in civilian practice." *Harris,* 29 M.J. at 170. The Rules for Courts–Martial describe the act of apprehension:

*How an apprehension may be made.*

(1) *In general.* An apprehension is made by clearly notifying the person to be apprehended that person is in custody. This notice should be given orally or in writing, but it may be implied by the circumstances.

R.C.M. 302(d). In this case, plaintiff was not clearly notified by Special Agent Medley that he was in custody, either orally or in writing. *See* Def.'s Facts ¶ 4 (stating that Special Agent Medley, to explain his order to remain seated and wait, told plaintiff "that it was standard procedure to *release* a person interviewed by AFOSI to his First Sergeant" (emphasis added)). Plaintiff does not dispute these facts. Pl.'s Facts ¶ 4; *see* Compl. at 4 (stating that these facts "might be considered an apprehension because *after I left the building* [Special Agent] *Moreta* ... did place me under [a]pprehension" (emphasis added)). Because the undisputed facts show that no oral or written notice of apprehension was given to plaintiff by Special Agent Medley, the court examines whether, under the circumstances, Special Agent Medley's order could constitute an apprehension by implication.

"The question of whether an apprehension has occurred, as opposed to whether an apprehension was lawful, is primarily one of fact to be resolved by the factfinders." *United States v. Kinane,* 1 M.J. 309, 314 (C.M.A. 1976). It is important to note certain differences between civilian arrest and military apprehension that relate to a service member's duty to obey orders:

> There are obvious differences between the military and civilian practices which prevent a literal application of the *Dunaway* [*v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)] doctrine. The obligations of the military member occasioned

serving as a guard, or bearing arms." R.C.M. 304(a)(3). But the status of arrest permits "requiring the person arrested to do ordinary cleaning or policing, or to take part in routine training and duties." *Id.* These descriptions of pretrial restraint show that the duration of an arrest may be a matter of days and weeks, rather than a matter of minutes and hours, as was the order to plaintiff to remain seated in the OSI building. *See United States v. Acireno,* 15 M.J. 570, 571 (C.M.A.1982) (reviewing arrest that continued for 153 days).

9. A confinement is an actual "physical incarceration," and is the "most severe" type of pretrial restraint. *Acireno,* 15 M.J. at 571.

10. This is a reference to the Uniform Code of Military Justice (UCMJ). *See* R.C.M. 103(4).

11. *See supra* note 7 (discussing the initial inquiry that would be required before the court could inquire into the existence of probable cause).

by his military status and by the relationships inherent in a military organization are different from those of the citizen to the police. There are numerous situations in the military context where a military person is required to provide information to military authorities without consideration of the existence of probable cause to detain. This may occur on the street, in offices, and in hearing rooms, as well as in places specifically provided for interrogation. And the obligation to report to such places for the purpose of giving such information, if properly related to the military mission, is a valid military duty.

*United States v. Schneider,* 14 M.J. 189, 192 (C.M.A.1982) (citations omitted).

In the military context, a simple order to stay in one place, to go somewhere or to accompany someone does not necessarily rise to the level of an apprehension. *See United States v. Garcia–Lopez,* 16 M.J. 229, 230–32 (C.M.A.1983) (finding that ordering a soldier to stay in his room while it was searched pursuant to an investigation was not an apprehension); *United States v. Sanford,* 12 M.J. 170, 172–74 (C.M.A.1981) (finding that ordering a soldier to go see a lieutenant, and following him closely, without specifying that the soldier would be interrogated, did not constitute an apprehension); *United States v. Thompson,* No. NMCM 94 01502, 1995 WL 935045, at *1–*2 (N.M.Ct.Crim.App. May 31, 1995)[12] (finding that an officer who informed a voluntarily returned absentee that the officer was going to escort the service member to his ship did not have the service member under apprehension). To compare the circumstances of Special Agent Medley's order to the facts in analogous military cases, the court reviews that order's underlying rationale.

Special Agent Medley was following a standard practice for the release of a suspect after interrogation "to their commander or

first sergeant." AR at 83. That practice "serves to inform the command of the situation and allow the command the opportunity to take any necessary action prior to releasing the member. It also provides for the protection of the member, who may be distraught after being questioned by the OSI." AR at 83–84.

The rationale of assuring control of the person by his command is similar to the rationale for escorting a voluntarily returned absentee service member to his ship. *See Thompson,* 1995 WL 935045, at *1 (stating that the purpose of escorting returned absentees back to their commands is "to ensure that they arrive"). Being ordered to wait for his First Sergeant, *see* AR at 48 (stating in investigator's report that Special Agent Medley "told him to have a seat until his first sergeant ... picked him up"), does not amount to an apprehension, in this case, any more than being ordered to be escorted amounted to an apprehension in *Thompson. See id.* at *2 ("[T]he circumstances of record did not convey to the [service member] the reasonable impression that he was being placed in custody."). Here, the interrogation, fingerprinting and photographing were completed and plaintiff had been informed that he was being released to his First Sergeant. Def.'s Facts ¶ 4. Violating the command to wait for his First Sergeant is similar to fleeing an escort, as in *Thompson,* where the court found that such an act was not an escape from custody, but "certainly subject to prosecution for [the] ultimate refusal to comply with [the] order [to accompany the escort]." 1995 WL 935045, at *2. Here, plaintiff was not apprehended, and simply disobeyed a lawful order to wait for his First Sergeant.

The rationale of protecting a service member may also justify an order to remain in a law enforcement facility without having that order rise to the level of an apprehension.

**12.** *Thompson* is an unpublished decision. According to the United States Navy–Marine Corps Court of Criminal Appeals Rules of Practice and Procedure, unpublished decisions " 'do[] not serve as precedent.' Citations to published cases are favored; however, citations to unpublished cases are permissible. The [United States Navy–Marine Corps Court of Criminal Appeals] views citation to unpublished cases merely as persuasive authority." United States Navy–Marine Corps Ct.Crim.App. R. Practice and P. § 6–4, http://www.jag.navy.mil/html/nmccahome.htm (last visited Apr. 26, 2004). This court views the unpublished *Thompson* opinion as persuasive authority, and the analysis therein as instructive.

In *United States v. Varraso*, the service member contested a murder conviction, in part based on an order that required her to be taken to the MP station, where she was kept for five hours without interrogation. 15 M.J. 793, 794–96 (A.C.M.R.1983). That order was found not to be an apprehension, because part of its rationale was to segregate the service member and to protect her from the anger of her fellow soldiers who presumed her involvement in the death.[13] *Id.* at 796. Here, the practice followed by Special Agent Medley made sure that a potentially distraught service member would be offered the protection of his command after an interrogation. AR at 84. Here, plaintiff was not apprehended by the order to wait for his First Sergeant; he simply disobeyed a lawful order to remain where he was.

Nothing in the circumstances of Special Agent Medley's order implied that plaintiff was under apprehension under Article 7, UCMJ. The requirement for probable cause for an apprehension, R.C.M. 302(c), does not apply to the facts of this case. *See* R.C.M. 302(a)(1) Discussion ("This rule does not affect any seizure of the person less severe than apprehension.").

The court finds that the AFBCMR decision holding that Special Agent Medley's order "was not contrary to established law or regulation," AR at 176, is supported by substantial evidence.

c. Whether the Fourth Amendment Was Violated by Special Agent Medley's Order

 There may be seizures of the person in the military context, not rising to the level of an apprehension, that are subject to Fourth Amendment analysis. *See Garcia–Lopez*, 16 M.J. at 231 ("Of course, there can be restraint of personal freedom which constitutes a seizure of the person for purposes of the Fourth Amendment, but which falls short of apprehension."); *Kinane*, 1 M.J. at 315 n. 16 (stating that "any limitation or restraint of an individual's freedom of movement by a police official constitutes a seizure of the person thereby setting in motion Fourth Amendment safeguards"). When applied to investigations by the military, and particularly to the investigatory interview context where a suspect has been questioned at the investigator's office, the question of whether a seizure has occurred appears to turn on whether the suspect is free to leave. *See United States v. Thomas*, 21 M.J. 928, 934–36 (A.C.M.R.1986) (not requiring probable cause for the first part of the interview where suspect responded to order to report for interview, but requiring probable cause for the remainder of interview once suspect had asked if he could leave and was told that he should stay); *United States v. Price*, 15 M.J. 628, 631–32 (N.M.C.M.R.1982) (concluding that the suspect was not seized, and his interview did not require probable cause, when the conditions of his investigatory interview were identical to those of six witnesses and three other suspects and where he "was under no more restraint, obligation to appear or remain for interview [than the other nine interviewees]"). Both *Thomas* and *Price* rely on *United States v. Schneider*, 14 M.J. 189 (C.M.A.1982), for their analysis of whether probable cause was required for the military's investigative interview, *Thomas*, 21 M.J. at 933; *Price*, 15 M.J. at 631–32, and *Schneider* is instructive for reviewing the applicability of Fourth Amendment protections in military investigations.

The appellate counsel in *Schneider* argued that Mr. Schneider's confession should have been suppressed because it was obtained during a "custodial interrogation [that was] based on an insufficient showing of probable cause." 14 M.J. at 190. That court's detailed treatment of how constitutional rights

---

**13.** The service member's commander was also motivated to send the service member to the MP station so that she could be watched. *Varraso*, 15 M.J. at 796. While the court's opinion does not state why (in addition to the risk of flight) the commander wanted the service member watched, the opinion supports the inference that the service member was a suicide risk as there is some indication that a joint suicide was planned. *See id.* at 795 n. 2 ("From the record of trial it appears [the service member and the victim] contemplated a joint suicide ...."). It appears that the commander could have also wanted the service member watched to prevent her from harming herself.

differ in the civilian and military contexts explained:

It is the recognition of this peculiar military obligation [of reporting for investigative interviews] that compelled the Congress to provide safeguards against self-incrimination, not to suspend the necessary flow of information but to protect the unwary subordinate against the subtle coercion of the military rank structure. Thus, in the military milieu, the focus has been on the protections accorded by Article 31 [UCMJ, 10 U.S.C. § 831 (2000), titled "Compulsory self-incrimination prohibited"], the Fifth Amendment equivalent, rather than on the nature of the infringement of the person's freedom of movement (Fourth Amendment).

*Schneider*, 14 M.J. at 192–93. In *Schneider*, the suspect was brought to the investigative office under guard, directly from the hospital. *Id.* at 190, 193. All other suspects for arson related to four suspicious fires had been eliminated by the time Mr. Schneider was interviewed. *Id.* at 190. After being read his rights, Mr. Schneider initially denied but later confessed to setting the fires. *Id.* The court held that the Fourth Amendment required probable cause for Mr. Schneider's custodial interrogation. *Id.* at 193.

The *Schneider* court, it must be emphasized, was concerned with a confession obtained in an interview, not the mechanics of how the interview was terminated and whether the interviewee was free to go. *See id.* ("After having crossed the 'threshold requirement' of 'voluntariness,' we must look to the conditions surrounding the taking of the accused's confession to see if they amount to custodial interrogation."). And when that court discussed a list of the conditions [14] to be examined for determining which military interviews constitute custodial interrogations, the court stated that those conditions were ultimately to be examined in rela-

tion to a confession. *See id.* at 195 ("Lastly, do these conditions directly relate causally to the accused's decision to make a confession?"). Therefore, the *Schneider* analysis of the conditions that produce a custodial interrogation in the military, and the focus on the concept of restriction on a service member's freedom of movement, may be most relevant when considering the fruit gathered from an investigation that involved an alleged seizure that may have violated the Fourth Amendment, that is, when considering the admissibility of an incriminating confession that resulted from the custodial interrogation.

The custodial interrogation analysis has also been used to review the admissibility of evidence obtained after an alleged seizure of the person that violated the Fourth Amendment. In *United States v. Scott*, the United States Court of Military Appeals reviewed the admissibility of a confession and "other derivative evidence" in a murder case. 22 M.J. 297, 298 (C.M.A.1986). The suspect's "freedom of locomotion had been restricted more than momentarily for a law-enforcement purpose" when he was brought in for questioning, *id.* at 302, where he "would not have been entirely free to leave," *id.* at 303, and because "the restraint was related to law-enforcement, *not to accomplishing a military mission*," *id.* (emphasis added). The court cautioned that "without probable cause, an investigator may not detain a criminal suspect more than briefly *for the purpose of interrogation*." *Id.* (emphasis added). The court found that the suspect "*was being subjected* to custodial interrogation." *Id.* (emphasis added). That custodial interrogation resulted in permission to search the suspect's locker, which produced the suspect's bloodstained jeans and an eventual confession, once the results of a lab analysis of the stains had been delivered to the interrogator. *Id.* at 301. The court found that the detention

---

14. The *Schneider* court stated that "we do not wish to be thought to hold that every interrogation at the 'police station' amounts to custodial interrogation." The court explained why:

The conditions under which an accused comes to the office bear examination: Did he report voluntarily? Was he ordered to report? Was he brought in under guard?

Was he a suspect? Further, what relation do these conditions have to the interrogation? Was the accused free to leave at any time? May he depart by himself? Must he remain under guard? Lastly, do these conditions directly relate causally to the accused's decision to make a confession? These are all questions which should be developed at trial . . . .

*Schneider*, 14 M.J. at 195 (footnote omitted).

for custodial interrogation required adequate probable cause. *Id.* at 303–04. In *Scott,* the court's analysis of the alleged custodial interrogation was for the purpose of determining whether the interrogation, enhanced in its effect by the restricted freedom of movement of its subject, produced coerced incriminating evidence.

The fundamental difference between plaintiff's case and these other military cases is that his interview was terminated before the order by Special Agent Medley allegedly converted the terminated interview into a custodial interrogation. There was no "interrogation" following the order, and the court finds that the restriction on plaintiff's freedom of movement was not for a law enforcement purpose, as were the restrictions in *Schneider* and *Scott.* The restriction in this case was for a military purpose, and that type of restriction is not subject to the *Schneider* analysis of the law enforcement interview conditions that require probable cause. *See Varraso,* 15 M.J. at 796 (finding that a commander's order that sent suspect to wait at "the MP station has no more legal significance in this case, than had the commander sent her to a room in the barracks, the post library or any other convenient place to await developments in the on-going . . . investigation" and that such order was not an illegal apprehension or arrest); *United States v. Davis,* 2 M.J. 1005, 1007–08 (A.C.M.R.1976) (finding that the commander's order to hold a suspect for one hour in the commander's office but not subjecting suspect to questioning during that period, while the commander gathered additional information regarding suspected drug dealing, did not violate the Fourth Amendment despite the lack of probable cause). Special Agent Medley's order similarly did not create a custodial interrogation, because no interrogation followed that order; therefore, the order did not require probable cause to be issued.[15]

The *Davis* court conducted a reasonableness inquiry to test the hour-long detention of a suspect and considered factors including "the nature of the offense of which [the accused is] suspected, the quantity and quality of the information available, the nature and duration of the detention and the motive of the person effecting the detention." *Id.* at 1008. A reasonableness inquiry tests a law enforcement practice for soundness under the Fourth Amendment, even if that practice does not require probable cause. *See Wiley v. Dep't of Justice,* 328 F.3d 1346, 1350 (Fed. Cir.2003) (stating that "[t]he fundamental precept of the Fourth Amendment . . . is that a search must be *reasonable,* and although both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, . . . in certain limited circumstances neither is required" (quotation omitted)). As the United States Supreme Court said in *Delaware v. Prouse:*

---

**15.** Plaintiff also posited that Special Agent Medley's order might have begun or continued or terminated (all three possibilities might be read into plaintiff's discussion of this topic) an "investigative detention," and that such an investigative detention was not justified under a "less than probable cause standard" pursuant to R.C.M. 302(a)(1). *See* Compl. at 5 (arguing that "I posit the order itself created a restriction on my liberty, whether such be called an arrest, or an apprehension, or by whatever name one might call it, without probable cause or even 'less than probable cause' to support it," and, "while an investigative detention may be made on less than probable cause, it must be supported by something"); R.C.M. 302(a)(1) Discussion ("An investigative detention may be made on less than probable cause and normally involves a relatively short period of custody." (citation omitted)). Investigative detentions are imposed by the orders issued by military law enforcement officials "to assure that, until reasonable investi-

gative steps can be completed, evidence is not destroyed, crime scenes are not disarranged, and suspects do not flee." *United States v. Glaze,* 11 M.J. 176, 177–78 (C.M.A.1981) (finding that "a military policeman[ ] had a reasonable and articulable basis upon which to believe that [the] accused was off post without authority" and "was entitled to detain the accused for the brief period incident to a telephonic check on his status"). The undisputed facts in this case describe an interview at the OSI building that was terminated when plaintiff requested counsel. Def.'s Facts ¶ 4. The court has found no case which describes similar facts in the military context as an investigative detention. And, because Special Agent Medley's order was serving a military, not a law enforcement purpose, as the foregoing custodial interrogation analysis has shown, the order did not begin an investigative detention, either. The court rejects plaintiff's allegations concerning an investigative detention as unsupported by the undisputed facts of this case.

[T]he permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. Implemented in this manner, the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against an objective standard, whether this be probable cause or a less stringent test. In those situations in which the balance of interests precludes insistence upon some quantum of individualized suspicion, other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not subject to the discretion of the official in the field.

440 U.S. 648, 654–655, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (quotations and footnotes omitted).

The court in *Schneider* discussed civilian and military precedent interpreting the Fourth Amendment and stated that "we are not free to ignore the decisions of the Supreme Court, but must, instead, attempt to fit them into the context of military society." 14 M.J. at 193. This court has stated a similar approach:

The [F]ourth [A]mendment does protect members of the [A]rmed [F]orces from unreasonable searches and seizures. However, the military's implementation of the [F]ourth [A]mendment protection is different from that employed in civilian matters.

*Henson v. United States,* 27 Fed.Cl. 581, 592–93 (1993) (citations omitted). The *Henson* court went on to say that

[t]he relationship between a serviceman and his commander is different from the relationship between a civilian and a magistrate. Servicemen have less expectation of privacy while living on a military installation, and a military commander has considerably more interest in being informed of all activities in the area of his command.

*Id.* at 593.

Here, Special Agent Medley's order served the purpose of informing plaintiff's commander of the investigative interview and of protecting a potentially distraught interviewee. AR at 83–84. A commander has "'responsibilities for the welfare and combat readiness of the personnel under his command.'" *Henson,* 27 Fed.Cl. at 593 (quoting *United States v. Stuckey,* 10 M.J. 347, 359 (C.M.A.1981)). The order followed standard procedures. AR at 83. Because Special Agent Medley followed standard procedures, plaintiff was not "subject[ed] to the discretion of the official in the field." *Delaware v. Prouse,* 440 U.S. at 655, 99 S.Ct. 1391 (quotation omitted). Under relevant Fourth Amendment precedent, as interpreted in the military context, Special Agent Medley's order did not offend the Fourth Amendment. The court notes that if a court goes too far in imposing unrealistic seizure standards on military investigations, the court, to quote the United States Navy–Marine Court of Military Review, may "virtually proscribe investigatory interview in the military milieu except where probable cause can be articulated." *Price,* 15 M.J. at 632. This court finds that Special Agent Medley's order does not offend the Fourth Amendment because it was not an unreasonable seizure. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons ... against unreasonable ... seizures, shall not be violated ....").

The court finds that the AFBCMR's conclusion that Special Agent Medley's order was "both lawful and reasonable and was not contrary to established law," AR at 176, is supported by substantial evidence and was not arbitrary or capricious.

## III. Conclusion

The court DENIES defendant's motion to dismiss. The court GRANTS defendant's motion for judgment upon the administrative record. The complaint shall be DISMISSED, and judgment entered for defendant. No costs.

IT IS SO ORDERED.