# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
COOK, CAMPANELLA, and HAIGHT
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist JEREMY N. MORLOCK**
**United States Army, Appellant**

ARMY 20110230

Headquarters, I Corps
Kwasi L. Hawks, Military Judge
Colonel Walter M. Hudson, Staff Judge Advocate

For Appellant:  Major Richard E. Gorini, JA; Captain Matthew R. Laird, JA (on brief).

For Appellee:  Colonel John P. Carrell, JA; Lieutenant Colonel James L. Varley, JA; Major Robert A. Rodrigues, JA (on brief).

30 April 2014

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

COOK, Senior Judge:

A military judge sitting as a general court-martial convicted appellant, pursuant to his pleas, of one specification of conspiracy to commit premeditated murder, one specification of conspiracy to commit an assault consummated by battery, one specification of wrongful use of hashish, three specifications of premeditated murder, and one specification of obstructing justice, in violation of Articles 81, 112a, 118, and 134,  Uniform Code of Military Justice, 10 U.S.C. §§ 881, 912a, 918 and 934 [hereinafter UCMJ].[1]  The military judge sentenced appellant to a dishonorable discharge, confinement for life with the possibility of parole, forfeiture of all pay and allowances, and reduction to the grade of E-1.  The convening authority, pursuant to a pretrial agreement and his Article 60(c), UCMJ, authority, only approved twenty-two years of confinement but otherwise approved

---

[1] Pursuant to a pretrial agreement, one specification of violating a lawful general order and one specification of assault consummated by battery, violations of Articles 92 and 128, UCMJ, were dismissed by the military judge.

the adjudged sentence. Additionally, the convening authority credited appellant with 352 days against his sentence to confinement.

This case is before us for review pursuant to Article 66, UCMJ. Appellant raises one assignment of error, which merits discussion and relief. Appellant also personally raises matters pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), that do not merit discussion or relief.

## BACKGROUND

In his lone assignment of error, appellant alleges:

> THERE IS A SUBSTANTIAL BASIS IN LAW AND FACT TO QUESTION APPELLANT'S PLEA OF GUILTY TO SPECIFICATION 1 OF CHARGE II (PREMEDITATED MURDER) BECAUSE THE MILITARY JUDGE DID NOT ELICIT FACTS TO SUPPORT THAT THE DEATH RESULTED FROM THE ACT OF THE ACCUSED AS CHARGED IN THE SPECIFICATION AND NOT AN INTERVENING CAUSE.

Appellant was charged, *inter alia*, with one specification of conspiracy to commit premeditated murder and three specifications of premeditated murder. In general, the conspiracy involved an agreement between appellant and other soldiers from his unit, while deployed to Afghanistan, to murder non-hostile Afghan males through the use of grenades and automatic weapons and then claim their victims had either committed a hostile act or exhibited hostile intent. The three murders with which appellant was charged were committed in furtherance of this conspiracy.

*Specification 1 of Charge II*: *Premeditated Murder*

At trial, appellant pleaded guilty to the conspiracy charge and its specification and all three murder specifications. Specification 1 of Charge II alleged appellant violated Article 118, UCMJ as follows:

> [Appellant], U.S. Army, did, at or near Forward Operating Base Ramrod, Afghanistan between . . . 1 January 2010 and . . . 31 January 2010, with premeditation, murder a male of apparent Afghan descent by means of throwing a grenade at him and shooting him with firearms.

2

*Stipulation of Fact*

Appellant, as part of his pretrial agreement to plead guilty, entered into a stipulation of fact. In regards to the murder alleged above, appellant admitted:

> [Appellant] and [Private First Class (PFC)] Andrew Holmes . . . were positioned behind a wall near an open field where they were approached by an unarmed Afghan male. [Appellant] and PFC Holmes agreed to implement one of the scenarios[2] suggested by [Staff Sergeant (SSG)] Gibbs to unlawfully kill the approaching Afghan male.
>
> . . . .
>
> The [male] was not acting suspiciously or in any way that resembled a threat.
>
> . . . .
>
> When the [male] was approximately 20 meters from the wall, [appellant] told him to "stop" in Pashtu. At the time [appellant] told [him] to stop, nothing about the [male's] threat posture had changed.
>
> When the [male] stopped, [appellant] dropped [a] grenade over the side of the wall. . . . PFC Holmes fired several rounds at the [male] with his [Squad Automatic Weapon (SAW)]. Shortly after PFC Holmes fired his weapon, the grenade exploded. As the grenade exploded, [appellant] and PFC Holmes took cover behind the wall. [Appellant] then raised himself over the wall and fired several shots in the direction of the [male]. After [appellant] and PFC Holmes fired, the [male] lay bleeding on the ground.
>
> [Appellant] proceeded to radio a [false] situation report to his squad leader. [Appellant] stated that the [male] had approached his position, that the [male] had refused to comply with his commands, and that PFC Holmes had identified a grenade in the [male's] possession.

---

[2] The stipulation of fact explained that "scenario" was the term developed by appellant and his co-conspirators for plans to "stage unlawful killings of Afghan noncombatants and pretend the noncombatants were insurgents posing a threat to American forces."

. . . .

> Prior to [appellant] dropping the grenade and PFC Holmes firing his weapon at the . . . male, [appellant] had the premeditated design to kill his victim. [Appellant] had formed the specific intent to unlawfully kill the . . . male and considered his actions intending to bring about his death.

> [Appellant] admits the collective actions of [appellant] and PFC Holmes dropping a grenade near and shooting the . . . male respectively caused his death.

*Providence Inquiry*

At the outset of the providence inquiry into the premeditated murder offenses, the military judge explained the elements of each specification and provided the definition for "premeditated design to kill." Subsequently, the military judge directed appellant to "take me to January of 2010, and tell me what happened" with respect to Specification 1 of Charge II, which prompted the following colloquy:

> ACC: [M]yself and PFC Holmes . . . were just in place pulling . . . security . . . and . . . we were approached by an Afghan male, and . . . me and PFC Holmes made an agreement . . . to go ahead with one of these scenarios . . . that had been previously talked about with [SSG] Gibbs. This involved a fragmentary grenade . . . that had been given [to me] by [SSG] Gibbs in previous weeks . . . we were behind a wall, sir, the [Afghan male] was roughly about 20 meters and to our front . . . . Holmes was positioned -- his weapon was on top of the wall directed towards the [male], and I began to prep the fragmentary grenade, sir. I asked Holmes if he was ready, I dropped the grenade on the other side of the wall, Holmes let out a burst of his SAW, and then the grenade exploded. I had stood back up to see the [male], and fired off a few shots with my weapon . . . and made a radio call to my squad leader to give him a situation report on . . . what we wanted everyone to believe happened, sir.

> . . . .

4

MJ:  Is it fair to say that you and PFC Holmes were not aware of any specific threat coming from this guy when the incident you told me about happened?

ACC:  Yes, sir.  No direct threat from the individual, sir.

. . . .

MJ:  This scenario was basically, you told Holmes, "the prior agreement we had to kill a noncombatant, we are going to put that into effect now?"

ACC:  Yes, sir.

. . . .

MJ:  And then [PFC Holmes] threw a grenade?

ACC:  I dropped a grenade over the wall, sir.

MJ:  Why did you do that?

ACC:  It was to . . . simulate . . . it was thrown at us from the Afghani individual, sir.

MJ:  And then [PFC Holmes] opened with -- did he have a SAW?

ACC:  A SAW, sir.

MJ: And then what happened to the guy after the grenade went off and the firing?

ACC:  When I stood back up from the wall after Holmes' burst and then the grenade went off sir that was the first time that I saw the individual after the gunfire.  He was laying on the ground . . . presumably dead, I believe, sir.

At this point, the military judge began a more exacting inquiry to examine precisely how and when the victim was killed and which of the co-conspirators was directly responsible for the fatal wounds.

MJ:  Did you ever investigate [the Afghan male]?

ACC:  Not immediately . . . no.

MJ:  . . . [D]id anyone ever go up to the body?

ACC:  Eventually sir, yes.

MJ:  And what happened?  What was his condition?

ACC:  He was deceased, sir.

MJ:  Was there any medical inquiry into what killed him?

ACC:  No, sir, not that I am aware of.

MJ:  Do you have a lay opinion?

ACC:  I believe he was deceased from bullet wounds, sir.

MJ:  Could you see that he was clearly shot?

ACC:  Yes, sir.

MJ:  Was it [PFC] Holmes' SAW that shot him?

ACC:  I would believe so, sir.

MJ:  Did you shoot him?

ACC:  I don't know if I -- directly my rounds made it to the individual.  Like I said, sir, after I was in the middle of a radio call, and just kind of blindly fired in his direction, sir.

MJ:  But you shot at him, but like you said, you weren't really aiming shots?

ACC:  Yes, sir.

MJ:  And at the rate of PFC Holmes' SAW . . . you think it's probably more likely that his bullets were the ones that struck this guy?

ACC:  Yes, sir.

Then, the military judge began exploring the possibility of whether anyone other than appellant or PFC Holmes could have been responsible for the victim's death.

> MJ: Any chance that someone else shot these guys? Did you see anybody else, or anybody else ever later say, "hey, I was firing?"
>
> ACC: Yes, sir. Not in the direct incident . . . as far as the time that me and Holmes fired, but after my situation report was called up, sir, I was reinforced . . . by members of the platoon, my squad leader. Staff Sergeant [S] arrived at my location, and I believe he was given an order from the [company executive officer] who was out with us that day, Captain [M], to -- I believe the words were something, to make sure that the individual was dead. And Sergeant S took that as approach the individual and release two shots into the man at pretty close range, sir.
>
> MJ: Did [SSG S] shoot him in the head?
>
> ACC: I couldn't tell you exactly, sir.
>
> MJ: But he fundamentally performed a *coup de grace* -- --
>
> ACC: Yes, sir.
>
> MJ: [Staff Sergeant S] shot him at close range with the intent of killing him?
>
> ACC: Yes, sir.
>
> MJ: [E]lement two of Specification 1 of Charge II. . . . [alleges] that his death, this . . . male of apparent Afghan descent resulted from your throwing a grenade or shooting at him . . . . How do you know that you, or PFC Holmes, which [sic] is a member of the conspiracy, killed him?
>
> ACC: I can only assume, sir, that a burst from an automatic weapon, you know, and comparatively close distance to a fragmentary grenade going off . . . that would be the end result.

Soon thereafter, the military judge halted the providence inquiry and asked defense counsel, "[i]f the death resulted from SSG S's action [the "*coup de grace*"], was that an intervening cause or . . . at that point does the manner of death become Specialist Morlock's report that this person is a combatant?" Defense counsel asked for a "moment" to discuss this alternate theory with his client.

While defense counsel conferred with appellant, the military judge asked government counsel, "[w]as there any medical evaluation on this 15 January homicide that establishes exactly whose bullets or what his manner of death was?" Government counsel responded that there was no such evidence. Next, the military judge asked the prosecutor, "[w]hat is your theory of liability?" to which he responded "the death resulted from the actions of PFC Holmes and [appellant], sir." The military judge asked, "[i]f it turns out that's not true, is there an alternate theory . . . ?" Government counsel answered, "yes."

The military judge turned back to appellant and inquired whether "you have any reason to think that [the grenade's] concussive blast injured the man?" Appellant responded that "I believe it's possible . . . but I wouldn't be able to tell you for sure . . . ." He then asked, "[c]an you tell me for sure whether your bullets or [PFC] Holmes' bullets are definitely the reason why this guy is dead?" Appellant responded, "No, sir." This lack of certainty directly contradicted the stipulation of fact, wherein appellant admitted "the collective actions of [appellant] and PFC Holmes dropping a grenade near and shooting the Afghan male respectively caused his death." It also stands in contrast to other portions of the providence inquiry wherein appellant, at a minimum asserted it was safe to "assume" he and PFC Holmes killed the victim with a grenade and automatic weapons.

At this point in the inquiry, any inconsistencies could have been fairly easily resolved. Instead, the military judge instigated the parties' divergence from their original mutual understanding and began exploring various alternate theories by which appellant's actions could still support a murder conviction and preserve his guilty plea. As a result, the military judge and appellant ultimately agreed that appellant could be guilty of murder under a theory that appellant's false report was the proximate cause of the victim's death as it was reasonably foreseeable that SSG S would belatedly arrive on the scene and deliver a "*coup de grace*." Despite reaching this agreement, the apparent and significant inconsistency between this alternative theory and the theory of liability with which appellant was charged,[3] originally stipulated to, and pleaded guilty under, was never resolved.

---

[3] The specification does not mention SSG S, a "*coup de grace*," or actions resulting from appellant's false report.

**LAW AND DISCUSSION**

*Standard of Review*

A military judge's acceptance of a guilty plea is reviewed for an abuse of discretion. *United States v. Eberle*, 44 M.J. 374, 375 (C.A.A.F. 1996); *United States v. Rogers*, 59 M.J. 584, 585 (Army Ct. Crim. App. 2003). "The test for an abuse of discretion is whether the record shows a substantial basis in law or fact for questioning the plea." *United States v. Schell*, 72 M.J. 339, 345 (C.A.A.F. 2013) (citation omitted).

"If an accused sets up a matter inconsistent with the plea at any time during the proceeding, the military judge must resolve the apparent inconsistency, or reject the plea." *United States v. Phillippe*, 63 M.J. 307, 309 (C.A.A.F. 2006) (internal quotation marks and citations omitted); *see also* UCMJ art. 45(a).

Additionally, "[t]he record of trial must reflect not only that the elements of each offense charged have been explained to the accused, but also 'make clear the basis for a determination by the military trial judge . . . whether the acts or the omissions of the accused constitute the offense or offenses to which he is pleading guilty.'" *United States v. Brown*, ARMY 20110932, 2013 WL 3984614, at *3 (Army Ct. Crim. App. 29 July 2013) (mem. op.) (citing *United States v. Care,* 18 U.S.C.M.A. 535, 541, 40 C.M.R. 247, 253 (1969)). In order for a "plea of guilty to be knowing and voluntary, the record of trial must reflect that the elements of each offense charged have been explained to the accused by the military judge," and that the accused "understood how the law related to the facts" of each offense. *Schell*, 72 M.J. at 346.

*Premeditated Murder*

Premeditated murder is the "unlawful killing" of another person by an accused, who at the time of the killing, possessed a "premeditated design to kill." *See Manual for Courts-Martial*, *United States* (2008 ed.) [hereinafter *MCM*], pt. IV, ¶ 43.b(1). Here, the military judge did an adequate job of defining the elements of premeditated murder for appellant during his initial explanation of the offense. However, from this point forward, the military judge's various explanations of the offense and the facts he elicited to support the plea resulted in confused exchanges and a scattershot meeting of the minds.

*Liability as a Principal*

Article 77, UCMJ, provides that an accused may be liable for an offense as a principal if he "commits an offense . . . or aids, abets, counsels, commands, or procures its commission." *MCM*, pt. IV, ¶ 1.a(1), (2). Accordingly, both the

stipulation of fact and the initial portion of the providence inquiry into the abovementioned specification appeared to contemplate appellant's liability as principal—as either the perpetrator who directly committed the murder, or alternatively as an aider and abettor, whose "collective actions" with PFC Holmes "caused [the victim's] death."

The introduction of SSG S and a possible "*coup de grace*" into the providence inquiry created a significant inconsistency with not only the stipulation of fact but with finding appellant's causation of and liability for this murder as charged. Staff Sergeant S either fired into a person whom appellant and PFC Holmes had already killed, or he was the one who delivered the fatal blow because of appellant's false report. [4]

Faced with this major change to the fundamental premise of appellant's guilt to this offense, the military judge had the option of either resolving the inconsistency or rejecting the plea. *United States v. Garcia*, 44 M.J. 496 (C.A.A.F. 1996); *see also* Article 45, UCMJ; Rule for Courts-Martial 910(h)(2). He chose neither. Because the military judge failed to resolve this inconsistency or reject appellant's plea, this court will take appropriate action to resolve this issue.

### *Attempted Premeditated Murder*

Although we find appellant's plea improvident to the charged offense of premeditated murder, under the specific facts and circumstances of this case, we are able to affirm a conviction for the offense of attempted premeditated murder. *See*

---

[4] The military judge and counsel, after pondering a host of alternate theories of liability, settled on the notion that although appellant and PFC Holmes may not have killed the Afghan male with their weapons, the cumulative impact of their actions were the "proximate cause" of the victim's death. Specifically, appellant agreed with the military judge that: (1) he had placed the victim in a position "of peril" through not only targeting him with weapons, but by falsely reporting the victim had committed a hostile act; (2) Staff Sergeant S arrived at the scene as a direct result of appellant's actions, to include the false report; and (3) appellant could have intervened by telling SSG S "don't shoot . . . this guy is not our enemy," but failed to do so. Ultimately, appellant agreed with the military judge that "whether [his] bullets directly killed [the victim] or whether the situation [he] created led to this guy's death, he died as a result of what [he] and PFC Holmes did[.]" Although we decline to currently decide the viability of this theory, we have serious doubts it would survive an analysis involving an "intervening cause" defense pursuant to *United States v. Varraso*, 15 M.J. 793, 797 (A.C.M.R. 1983). It is unreasonable to foresee and expect a fellow soldier to either commit a war crime or blindly obey a patently unlawful order to execute a seriously wounded combatant who had been rendered *hors de combat*.

UCMJ art. 59. In carefully reviewing the entire record, to include those facts established in the stipulation of fact and during appellant's providence inquiry, and applying the additional elements of Article 80, UCMJ, we find the record objectively and overwhelmingly supports concluding that appellant provided the requisite factual basis for attempted premeditated murder, and that he "explicitly or inferentially . . . had sufficient knowledge" of this offense as well. *See United States v. Redlinski*, 58 M.J. 117, 119 (C.A.A.F. 2003). The elements of attempt are:

> (1) That the accused did a certain overt act;
>
> (2) That the act was done with specific intent to commit a certain offense under the code;
>
> (3) That the act amounted to more than mere preparation; and
>
> (4) That the act apparently tended to effect the commission of the intended offense.

*MCM*, pt. IV, ¶ 4.b.

Here, appellant admitted that he and PFC Holmes agreed to initiate a "scenario" in which they would kill an unarmed Afghan civilian in accordance with plans they had previously developed. Appellant and PFC Holmes identified their victim, and when the opportunity presented itself, each used a degree of lethal force with the specific intent to commit premeditated murder. These actions were not just "mere preparation," but vigorous and violent efforts to complete the underlying offense of premeditated murder. Although the providence inquiry did not firmly establish that appellant and PFC Holmes achieved their intended design, their use of a grenade and automatic weapons tended to effect the commission of the intended murder, and went well beyond the "preparatory steps" necessary to sustain an attempt conviction. *Redlinski*, 58 M.J. at 119. As such, we are able to affirm the offense of attempted premeditated murder and will do so in our decretal paragraph.

## CONCLUSION

Upon consideration of the entire record and the submissions by the parties, we affirm only so much of the finding of guilty of Specification 1, Charge II as finds that appellant:

> United States Army, did, at or near Forward Operating Based Ramrod, Afghanistan, between on or about 1 January 2010 and on or about 31 January 2010, attempt to commit premeditated murder upon a male of apparent Afghan

descent by means of throwing a grenade at him and shooting him with firearms, in violation of Article 80, UCMJ.

The remaining findings of guilty are AFFIRMED.

We are able to reassess the sentence on the basis of the error noted, and do so after conducting a thorough analysis of the totality of circumstances presented by appellant's case and in accordance with the principles articulated by our superior court in *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013) and *United States v. Sales*, 22 M.J. 305 (C.M.A. 1986).

In evaluating the *Winckelmann* factors, we first find no dramatic change in the penalty landscape or appellant's punitive exposure which might cause us pause in reassessing appellant's sentence. The amended finding still carries a maximum sentence to confinement for life without parole. *See MCM*, pt. IV, ¶ 14.e. (twenty year confinement limit for attempt offenses does not apply to attempted murder). Further, appellant remains convicted of three other offenses, including two additional premeditated murders, that each independently carry a maximum sentence to confinement for life without parole. Second, appellant pleaded guilty in a judge-alone court-martial. Third, we find the nature of the remaining offenses still captures the gravamen of the original offenses, and the circumstances surrounding appellant's conduct giving rise to the amended offense remain admissible with respect to the attempted premeditated murder and relevant to a number of the remaining offenses. Finally, based on our experience, we are familiar with the remaining offenses so that we may reliably determine what sentence would have been imposed at trial.

Reassessing the sentence based on the error noted, the amended finding of guilty, the entire record and the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), we AFFIRM the sentence as approved by the convening authority. We find this reassessed sentence is not only purged of any error but is also appropriate. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of the findings set aside by our decision, are ordered restored. *See* UCMJ arts. 58b(c) and 75(a).

Judge CAMPANELLA and Judge HAIGHT concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court